**UNITED STATES of America,**
**Plaintiff–Appellee,**

v.

**Jose Alvaro GALLO,**
**Defendant–Appellant.**

**No. 89–2843.**

United States Court of Appeals,
Fifth Circuit.

March 19, 1991.

Ron Rainey, Richard Haynes, Houston, Tex., for defendant-appellant.

Kathlyn G. Snyder, Paula C. Offenhauser, Asst. U.S. Attys., Henry K. Oncken, U.S. Atty., Houston, Tex., for plaintiff-appellee.

Before POLITZ, WILLIAMS, and JONES, Circuit Judges.

EDITH H. JONES, Circuit Judge:

## I.

Defendant–Appellant Jose Alvaro Gallo was convicted of conspiring to possess with intent to distribute in excess of five kilograms of cocaine, aiding and abetting the possession of in excess of five kilograms of cocaine with intent to distribute, and aiding and abetting the laundering of monetary instruments. On appeal, Gallo challenges the warrantless stop and search of his car, the sufficiency of the evidence, and the district court's refusal to group his offenses under U.S.S.G. § 3D1.2. Finding no reversible error, we affirm the judgment of the district court.

## II.

## BACKGROUND

Gallo was arrested on January 12, 1990, following the Drug Enforcement Administration's (DEA) surveillance of Miryam Balcazar and Jose Antonio Cruz.[1] On January 12, 1990, DEA agents observed the activities of Cruz and Balcazar until they met at a skating rink in Kingwood, Texas. At the skating rink, Cruz parked his car, a silver Honda, next to Balcazar's blue Oldsmobile. The DEA agents then observed Balcazar and Cruz conversing outside the cars. When Balcazar and Cruz left the skating rink parking lot, DEA agent Turner followed Cruz to a gas station where Cruz made a telephone call. About two minutes later Gallo entered the gas station, driving a brown Mazda RX7, and parked near Cruz's car. After a short meeting at the gas station, Cruz and Gallo drove to a nearby auto shop. At the auto shop, Cruz and Gallo parked their cars within five to eight feet of each other. They then exited their cars and after a brief conversation, Cruz removed a brown box from the back of his car and placed it in the rear of Gallo's car. After this transfer, both Cruz and Gallo exited the parking lot and headed in opposite directions on the freeway. Agent Turner followed Gallo and attempted to read the car's rear license plate to determine its ownership. The license plate was covered with mud and was unreadable, therefore, Turner sought assistance from the Harris County Sheriff's Office and the Houston Police Department (HPD).

Houston police officer, J.R. Knott, received a dispatch from the DEA requesting

---

1. Gallo, Balcazar, and Cruz were co-defendants at trial. Their appeals were initially consolidated, but this court dismissed Balcazar's and Cruz's appeals for failure to file timely notices of appeal. These dismissals do not affect Gallo's appeal.

a marked patrol car to check the license plate on a car that was currently being followed by a Harris County deputy sheriff. Officer Knott observed a Harris County Sheriff's car, with its emergency lights flashing, following a brown Mazda at a high rate of speed. Knott observed that the Mazda continued for several blocks without responding to the Sheriff's unit. Knott then pulled alongside the Mazda and signaled for the driver, whom he identified as Gallo, to pull over. After Knott had stopped Gallo he discovered that Gallo's driver's license was suspended. Knott placed Gallo under arrest for driving with a suspended driver's license.

After deciding to impound Gallo's car, Knott inventoried the contents of the car pursuant to HPD procedure. The only item in the car was a closed cardboard box, which was in the rear hatchback area of the car. Knott listed one cardboard box on his inventory slip. Generally, the HPD automobile inventory procedure requires an officer to list items found inside the vehicle. If, however, there are circumstances that indicate that valuable or dangerous items may be hidden in a container inside the car, then these containers may also be inventoried. Officer Knott testified that he had listed "one cardboard box" on the wrecker slip when someone suggested that he look inside the closed box. Knott decided to look in the box to determine if it contained something of value. When Knott opened the box he saw that it contained thin packets wrapped in aluminum foil. Knott did not inventory the contents of the box and did not investigate the contents of the aluminum-foil packets. After Knott completed his inventory of the car, the officers at the scene decided to drive the car to the police substation rather than have it towed to a storage lot. At the police substation, DEA agents searched the box and discovered $299,985 in United States currency wrapped in the aluminum-foil packets. Balcazar's fingerprints were later discovered on the aluminum-foil wrappings on the currency. Gallo told DEA agents that he did not know how the box got inside the car, and that someone else had put the box in the car.

Balcazar and Cruz were also arrested on January 12, 1990. When DEA agents arrested Balcazar they found a cardboard box, similar to the box in Gallo's car, that contained $300,000 in United States currency wrapped in aluminum-foil packets. The agents then obtained a search warrant and searched Balcazar's home where they found $1,240,810 in cash, part of which was wrapped in aluminum foil and placed in a brown suitcase and in a cardboard box. The agents also discovered a money counting machine. After Cruz was arrested, agents obtained a search warrant for his home where they discovered fifty kilograms of cocaine.

Gallo was tried by the district court, which denied Gallo's motion to suppress the $299,985 discovered in the box in his car and found Gallo guilty on all three counts.

### III.

## FOURTH AMENDMENT CLAIMS

### A. *The Stop of Gallo's Car.*

■ Gallo first contends that the police violated his rights under the fourth amendment by stopping his car to conduct an investigative search. The DEA agents and Houston police officers involved in this stop and arrest testified that they stopped Gallo because they believed that he had engaged in a narcotics transaction and because his rear license plate was obstructed with mud. Officer Knott also observed Gallo speeding and failing to respond to the Harris County Deputy Sheriff's emergency signal. Based on these traffic violations, Officer Knott had the right to stop Gallo. This court has held that "where police officers are doing what they are legally authorized to do ... the results of their investigations are not to be called into question on the basis of any subjective intent with which they acted." *United States v. Causey,* 834 F.2d 1179, 1184 (5th Cir.1987) (en banc). Therefore, even if the officers wished to stop Gallo to further their narcotics investigation, they did not violate Gallo's fourth amendment rights because Gallo's traffic violations

provided a legitimate reason for his stop and subsequent arrest. "[S]o long as the police do no more than they are objectively permitted to do, their motives in doing so are irrelevant and hence not subject to inquiry." *Id.*

### B. *The Search of the Box.*

Gallo next contends that the warrantless search of the box found in his car violated the fourth amendment. Apparently, Gallo is arguing that the district court erred by not suppressing the evidence discovered in this search. The Government contends that this search was justified as an inventory search or search incident to arrest. The district court found that this was a valid inventory search that conformed to the HPD's inventory procedures. In reviewing the district court's ruling on a motion to suppress based on live testimony at a suppression hearing, we must accept the district court's factual findings unless they are clearly erroneous or influenced by an incorrect view of the law. *United States v. Muniz–Melchor,* 894 F.2d 1430, 1433 (5th Cir.), *cert. denied,* —— U.S. ——, 110 S.Ct. 1957, 109 L.Ed.2d 319 (1990) (quoting *United States v. Maldonado,* 735 F.2d 809, 814 (5th Cir.1984)). Therefore, we must accept the district court's finding that the HPD inventory procedure allowed HPD to open the box to check for valuable or dangerous items. However, we must apply a *de novo* standard of review to determine whether this was a valid inventory search. *Id.*

When a car is impounded, the police generally inventory its contents to protect the owner's property while it is in police custody, to protect the police against claims of lost or stolen property, and to protect the police and the public from potential danger. *South Dakota v. Opperman,* 428 U.S. 364, 369, 96 S.Ct. 3092, 3097, 49 L.Ed.2d 1000 (1976). However, to prevent the police from conducting inventory searches as a ruse for general rummaging to discover incriminating evidence, standardized criteria or established routine must regulate the opening of containers found during inventory searches. *Florida v. Wells,* —— U.S. ——, 110 S.Ct. 1632,

1635, 109 L.Ed.2d 1 (1990). The police department's inventory procedures can allow an officer "latitude to determine whether a particular container should or should not be opened in light of the nature of the search and characteristics of the container itself." *Id.* If there is no showing that the police acted in bad faith, or for the sole purpose of investigation, evidence discovered during an inventory search is admissible. *Colorado v. Bertine,* 479 U.S. 367, 372, 107 S.Ct. 738, 741, 93 L.Ed.2d 739 (1987).

In this case, Officer Knott testified that he began an inventory search of Gallo's car, following HPD's standard procedures. Gallo argues that Knott violated those inventory procedures when he opened the box at the suggestion of an unidentified officer. Knott stated that he opened the box because he could not tell what it contained, and because HPD procedures required that he make a list of everything in an impounded car. Gallo argues that the search of the box was an "investigative foray" because Knott did not list the contents of the box on the inventory wrecker sheet. Knott testified, however, that after he opened the box and found the thin aluminum-foil packets, he turned the box and the car over to an officer from the HPD northeast substation, and that officer drove the car and the box to the substation to continue the inventory and impound the car. At the substation DEA agents searched the box. Agent Boyce, who supervised this second search, testified that he followed the box to the substation to observe HPD's inventory search of its contents. After the currency was discovered in the box, the HPD turned the box and its contents over to the DEA.

Insofar as HPD's policy permitted the opening of the box for the purposes previously described, we cannot condemn this inventory search. That the DEA rather than the HPD physically conducted the search is fortuitous: HPD surely had the right to do so, for example, to assure that no concealed explosive device was in the box. The coincidence between the DEA's suspicion that the box contained contraband and HPD's right to search the box for

its independent purposes does not in this case vitiate the validity of the search.[2]

Because we hold that the HPD and the DEA conducted valid inventory searches of the box, we need not decide if this was a valid search incident to arrest.

## IV.

### SUFFICIENCY OF THE EVIDENCE

A. *Drug–Related Offenses.*

■ Gallo challenges the sufficiency of the evidence to sustain his convictions for conspiracy to possess cocaine with intent to distribute, and for aiding and abetting the possession of cocaine with intent to distribute. In reviewing the sufficiency of the evidence, this court must examine the evidence in the light most favorable to the verdict and uphold the conviction " 'if a rational trier of fact could have found the essential elements of the offense beyond a reasonable doubt.' " *United States v. Rodriguez–Mireles,* 896 F.2d 890, 892 (5th Cir. 1990) (quoting *United States v. Ayala,* 887 F.2d 62, 67 (5th Cir.1989)). Further, this court accepts all credibility choices that tend to support the jury's verdict. *United States v. Yamin,* 868 F.2d 130, 133 (5th Cir.), *cert. denied,* — U.S. —, 109 S.Ct. 3258, 106 L.Ed.2d 603 (1989).

■ To establish a drug conspiracy, the government must prove: (1) the existence of an agreement between two or more persons to violate federal narcotics laws; (2) that the defendant knew of the agreement; and, (3) that the defendant voluntarily participated in the agreement. *United States v. Magee,* 821 F.2d 234, 239 (5th Cir.1987) (citing *United States v. Natel,* 812 F.2d 937, 940 (5th Cir.1987)). The Government is not required to prove the existence of the conspiracy and the agreement between the co-conspirators and the defendant by direct evidence, but may present circumstantial evidence, such as the co-conspirator's concerted actions, from which the jury can infer that a conspiracy existed. *Id.* (citing *United States v. Vergara,* 687 F.2d 57, 61 (5th Cir.1982)). The existence of the agreement, the defendant's knowledge of the agreement, and the defendant's participation in the conspiracy may be inferred from the " 'development and collocation of circumstances.' " *United States v. Lentz,* 823 F.2d 867, 868 (5th Cir.), *cert. denied,* 484 U.S. 957, 108 S.Ct. 354, 98 L.Ed.2d 380 (1987) (quoting *Vergara,* 687 F.2d at 61). "Although mere presence at the scene of the crime or close association with co-conspirators will not alone support an inference of participation in a conspiracy, presence or association is one factor that the jury may rely on, along with other evidence, in finding conspiratorial activity by a defendant." *Magee,* 821 F.2d at 239 (citing *Natel,* 812 F.2d at 940–41).

**2.** *Cf. United States v. Hahn,* 922 F.2d 243, 247 (5th Cir.1991) (IRS agents' search of closed brief case found in defendant's impounded car while car was stored in private lot was not a valid inventory search). In *Hahn,* this court held that the IRS agents' search of the defendant's car was not a valid inventory search because the IRS had no procedure for inventory searches, even though the search conformed to the inventory search procedures of the Midland Police Department (MPD). *Id.* at 2460. In concluding that the MPD's procedures were irrelevant, the court stated that:

... there is no evidence that the IRS agents were aware of the Midland police procedures (or any other) when conducting the search, or that they conducted the search on behalf of, or even with the knowledge of, the Midland police (none of whom were present). Nor is there any evidence that the Midland police procedure governed or purported to govern

inventory searches by federal officials in an instance such as this (or in any other instance).

*Id.* at 247. The court further stated:

... under the circumstances here, it could also be said with at least equal logic that the existence of the Midland police policy was wholly irrelevant to the instant search, as that policy neither applied nor purported to apply to this search, and the IRS agents conducting the search did not know of the policy and were not (and did not consider that they were) acting on behalf of the Midland police, who knew nothing of the search.

*Id.* This language, by negative implication, supports our holding that the search of the box found in Gallo's car was a valid inventory search that conformed to HPD procedures, even though DEA agents conducted the search. In this case, the DEA was acting on behalf of, and with the knowledge of, the HPD.

■ Gallo argues that the evidence is insufficient to establish that he knew the conspiracy existed and intentionally participated in it. Gallo also argues that there was insufficient evidence to establish that he knew the contents of the box recovered from his car. The Government responds that Gallo's participation in the conspiracy was established by circumstances showing a concert of action among Gallo, Balcazar, and Cruz. First, Cruz and Gallo met in a public place shortly after Cruz placed a call from a public telephone. Drug traffickers commonly arrange meetings following these procedures. Next, Gallo and Cruz drove to a nearby location where they conversed briefly, then simultaneously opened the rear doors of their cars and exchanged the box containing the currency. Gallo accepted the box from Cruz and it was later determined that Balcazar's fingerprints were on the aluminum-foil packets of money in the box. A large sum of money and a ledger were inside the box. The box that Gallo received was similar in appearance to a box containing $300,000 in currency, also wrapped in aluminum-foil packets, that Cruz transferred to Balcazar in exchange for over twenty-five pounds of cocaine. From these circumstances, the jury could reasonably infer that a conspiracy existed among Gallo, Cruz, and Balcazar. Along with the evidence showing the large quantity of money and the money counting machine recovered from Balcazar's residence, and the large quantity of cocaine recovered from Cruz's residence the jury could reasonably infer that the object of the conspiracy was the possession and distribution of narcotics for profit.

To infer Gallo's awareness of the nature of the conspiracy and his participation in it, the jury was entitled to consider the concerted action of Gallo, Balcazar, and Cruz, and the development of the circumstances. The Government established Gallo's knowledge of the contents of the box recovered from his car by reasonable inferences drawn from his control over the box and his inconsistent statements disclaiming knowledge of how the box got into his car. *See United States v. Martinez–Mercado,* 888 F.2d 1484, 1491 (5th Cir.1989) (incon-sistency in explanations allows for an inference of guilty knowledge). Therefore, the jury could reasonably conclude from the evidence that Gallo knew that he was transporting approximately $300,000 that was separated in aluminum-foil packets, and a ledger sheet.

From Gallo's knowing possession of such a large sum of money, which represented a necessary part of the conspiracy, it was reasonable for the jury to conclude that Gallo knew the object of the conspiracy. Drug traffickers are unlikely to entrust a large portion of the proceeds from their illicit trade to an outsider, especially when the outsider is aware of the valuable nature of the merchandise that he is transporting. This court has stated that:

> conduct consisting only of involvement in a single transaction may nevertheless be treated as rationally permitting the inference of knowledge of the broader conspiracy when the single act itself shows so much familiarity with or high level participation in the overall conspiracy as to be in and of itself indicative of the broader conspiracy.

*United States v. Hawkins,* 661 F.2d 436, 454 (5th Cir. Unit B 1981), *cert. denied, sub nom. McCain v. United States,* 456 U.S. 991, 102 S.Ct. 2274, 73 L.Ed.2d 1287 (1982) (quoting *United States v. Torres,* 503 F.2d 1120, 1124 (2d Cir.1974)). In this case, the evidence that Gallo was solely entrusted with a large portion of the proceeds of the drug trafficking enterprise establishes his familiarity with, or high level participation in, that enterprise. Therefore, the jury could reasonably conclude that such evidence established his knowledge of the broader conspiracy. Viewing these circumstances cumulatively, in the light most favorable to the verdict, there is sufficient evidence to support Gallo's conviction for conspiracy to possess cocaine with the intent to distribute.

■ To convict a defendant of possession of cocaine with the intent to distribute under 21 U.S.C. § 841(a)(1), the Government must prove beyond a reasonable doubt that the defendant (1) knowingly (2)

possessed cocaine (3) with intent to distribute it. *United States v. Richardson*, 848 F.2d 509, 511 (5th Cir.1988). The proof that the defendant knowingly possesses contraband will usually depend on inference and circumstantial evidence. *Id.* at 514. However, when the evidence is sufficient to establish the defendant's participation in a conspiracy to possess illegal narcotics, the defendant will be deemed to possess narcotics through his co-conspirator's possession. *United States v. Medina*, 887 F.2d 528, 532 (5th Cir.1989) (citations omitted).

■■■■] To convict a defendant of aiding and abetting under 18 U.S.C. § 2, the Government must prove (1) that the defendant associated with the criminal venture, (2) participated in the venture, and (3) sought by action to make the venture succeed. *Medina*, 887 F.2d at 532. The defendant must share the principal's criminal intent and engage in some affirmative conduct designed to aid the venture. *Id.* The evidence that supports a conviction for conspiracy can also be used to support a conviction for aiding and abetting in the possession of illegal narcotics with intent to distribute. *United States v. Sandoval*, 847 F.2d 179, 184 (5th Cir.1988). The same evidence that establishes Gallo's knowing and voluntary participation in the conspiracy also establishes his association with the criminal venture and participation in it. Because the evidence is sufficient to support Gallo's conspiracy conviction, and Gallo is deemed to have possessed cocaine through his co-conspirator's possession, we conclude that the evidence was sufficient to support his conviction for aiding and abetting the possession of cocaine with the intent to distribute.

### B. *Money Laundering.*

■■■ Gallo next challenges the sufficiency of the evidence to sustain his money laundering conviction. Gallo was convicted of aiding and abetting money laundering in violation of 18 U.S.C. § 1956(a)(1), which prohibits knowing involvement in a financial transaction that uses the proceeds of some form of unlawful activity. The term

"transaction" includes the "transfer, delivery or other disposition" of these proceeds. 18 U.S.C. § 1956(c)(3). "Financial transaction" means the "movement of funds by wire or other means ... which in any way or degree affects interstate of foreign commerce." 18 U.S.C. § 1956(c)(4).

Gallo was arrested while transporting $299,985 in his car on an interstate highway. To establish that Gallo knew that the money in his car was the proceeds of narcotics trafficking, the Government introduced evidence that Gallo received the box containing the money from Cruz, a suspected narcotics trafficker who had been under DEA surveillance for several months. Cruz transferred the box to Gallo shortly after making a call from a public phone, a common method for setting up meetings among drug dealers. The box in Gallo's car contained $299,895 in counted money, wrapped in aluminum-foil packets. The DEA found the fingerprints of Balcazar, another known drug dealer who had been under continuing DEA surveillance, on the packets in the box. After he was arrested, Gallo made two false exculpatory statements about the car and the box.

Additionally, the Government established that on the same day that Cruz engaged in this transaction with Gallo, he transferred $300,000, wrapped in aluminum-foil and placed in a cardboard box, to Balcazar in exchange for twenty-five kilograms of cocaine. The transfer between Cruz and Balcazar was very similar to the transfer between Cruz and Gallo. After searching Balcazar's house, the DEA discovered $1,240,810 and a money counting machine. After searching Cruz's house, the DEA discovered fifty kilograms of cocaine.

Based on the concert of action among Gallo, Cruz, and Balcazar, and Gallo's false statements, we conclude that the jury could reasonably infer that Gallo knew that he was transporting the proceeds of unlawful activity.

■■■ Gallo also asserts that the Government failed to establish that the transfer of currency in his car had any discernible impact on interstate commerce. Section 1956 applies to conduct that "in any way or

degree affects interstate or foreign commerce." 18 U.S.C. § 1956(c)(4). The legislative history of the Act indicates that this phrase was derived from the Hobbs Act, 18 U.S.C. § 1951, "and is intended to reflect the full exercise of Congress's power under the Commerce Clause." S.Rep. No. 433, 99th Cong. 2d Sess. 13 (1986). We defer in this instance to 21 U.S.C. § 801, Congressional findings and declarations, to establish that Gallo's transportation of the proceeds of drug trafficking affected interstate commerce.[3] Section 801 states that:

(3) A major portion of the traffic in controlled substances flows through interstate and foreign commerce. Incidents of the traffic which are not an integral part of the interstate or foreign flow, such as manufacture, local distribution, and possession, nonetheless have a substantial and direct effect upon interstate commerce because—

(A) after manufacture, many controlled substances are transported in interstate commerce,

(B) controlled substances distributed locally usually have been transported in interstate commerce immediately before their distribution, and

(C) controlled substances possessed commonly flow through interstate commerce immediately prior to such possession.

(4) Local distribution and possession of controlled substances contribute to swelling the interstate traffic in such substances.

21 U.S.C. §§ 801(3)(A), (B), & (C), and 801(4). The Congressional intent of this chapter is clear; drug trafficking affects interstate commerce. The proceeds of drug trafficking have a similar effect. Therefore, reserving judgment on a case in which the connection between the money and the drugs or illegal activity is not so clear as it is here, we conclude that Gallo's transportation of the proceeds of drug trafficking affected interstate commerce, and

that there is sufficient evidence to sustain his money laundering conviction.

## V.

## GROUPING OF OFFENSES UNDER THE SENTENCING GUIDELINES

Finally, Gallo contends that the district court erred in refusing to group counts 1 and 2 (drug offenses) with count 3 (money laundering) as closely-related offenses under Sentencing Guidelines § 3D1.2. If a defendant's offenses are grouped together, the most serious offense determines his base offense level. If the defendant's offenses are not grouped, the district court determines the combined offense level for two separate offenses. *United States v. Pope*, 871 F.2d 506, 509 (5th Cir.1989) (citing U.S.S.G. § 3D1.4). The district court held that money laundering was "a separate offense within the meaning of the guidelines" and refused to group Gallo's offenses.

 Section 3D1.2(d) divides offenses into three categories: those to which the section specifically applies; those to which it specifically does not apply; and those for which grouping may be appropriate on a case-by-case basis. *Pope*, 871 F.2d at 509. Gallo's offenses fall within this third category because not all of his offenses are specifically included or specifically excluded under § 3D1.2(d). The offense level determination for offenses in this third category is "in some parts legal rather than factual, and so is not shielded by the clearly erroneous standard. The determination does, however, depend on factual and case-specific conclusions. A reviewing court must therefore give 'due deference' to the district court, and respect the informed judgments made by that court." *Id.*

Gallo argues that the district court should have grouped count 3 with counts 1 and 2 because all three counts involved the same act or transaction and the same vic-

---

**3.** In its brief, the Government argued that interstate commerce was affected because: (1) Gallo transported the currency on two interstate highways and thus "relied on a mechanism designed to accommodate interstate commerce"; (2) the currency was printed in Washington, D.C.; and, (3) the packaging of the currency indicated that it "was going to travel or had travelled some distance." The Government abandoned these arguments at oral argument.

tim. Gallo argues that he committed "victimless crimes" in which society at large is the victim, and therefore his crimes affected only one victim. The guidelines, however, provide that "for 'victimless crimes' (crimes in which society at large is the victim), the grouping decision must be based primarily upon the nature of the interest invaded by each offense." U.S. S.G. § 3D1.2, Application Note 2. *See also Pope*, 871 F.2d at 510 (upholding district court's finding that two distinct harms and different societal interests were implicated by the separate offenses of possession of an unregistered silencer and the unlawful possession of a pistol by a felon). The Government argues that the drug-related offenses and the money laundering offense invade distinct societal interests; the distribution of illegal drugs affects the drug user and the community by increasing lawlessness and violence, money laundering disperses capital from lawfully operating economic institutions to criminals in and out of the country.

▆▆ "[W]e must look to the language of the guidelines and the explanatory comments to determine whether the district court correctly decided that [Gallo's] offenses were not 'counts involving substantially the same harm' under § 3D1.2." *Id.* at 509. The guidelines provide that counts should be grouped under § 3D1.2(d) "if the offense behavior is ongoing and continuous in nature." U.S.S.G. § 3D1.2(d). The guidelines also provide that for victimless crimes "the grouping decision must be based *primarily* upon the nature of the interest invaded by each offense" *Id.* at Application Note 2 (emphasis added). The record does not clearly establish whether Gallo's money laundering was a continuous and ongoing part of his drug-related offenses. Further, we find merit in the Government's argument that distinct societal interests were invaded by these offenses. Therefore, granting due deference to the district court's finding that counts 1 and 2 were separate offenses from count 3,

we find no error in the conclusion that Gallo's offenses should not have been grouped under § 3D1.2.[4]

## VI.

## CONCLUSION

We conclude that the warrantless stop of Gallo's car was authorized by his traffic violations, and the search of the box found in Gallo's car was a valid inventory search. Therefore, the district court did not err by admitting the evidence discovered in the stop and search. Further, sufficient evidence sustains Gallo's convictions, and the district court did not err by refusing to group Gallo's drug-related offenses with his money laundering offense under the sentencing guidelines. We AFFIRM the judgment of the district court.

---

4. In a supplemental pro se brief, Gallo contends that the district court erred in calculating his criminal history, erred by not granting him minimal participant status, and erred by not granting him a two point downward departure for acceptance of responsibility. We find that these contentions are without merit.