UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT

_____

No. 93-2768 c/w
No. 93-2769
No. 93-2779

_____

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

versus

RICHARD LEONARD,

Defendant-Appellant.

_____

No. 93-2769

_____

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

versus

RHONDA KELLEY and VERONICA McCRACKEN,

Defendants-Appellants.

_____

No. 93-2778

_____

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

versus

ALFRED C. GREENE, JR.,

Defendant-Appellant.

**Appeals from the United States District Court
for the Southern District of Texas**

(August 14, 1995)

Before KING and JONES, Circuit Judges, and KAZEN, District Judge.[*]

By EDITH H. JONES, Circuit Judge:

In this consolidated appeal, we reject challenges to the convictions and sentencing of four operators and employees of a Houston-based telemarketing scam. Alfred Greene, owner and operator of the business, and Richard Leonard, manager of the phone room, both entered pleas of guilty to wire and mail fraud, conspiracy, and using a false name to further a scheme to defraud. They waived their right to jury trial and contested the money laundering counts at a bench trial. Greene was convicted on several counts whereas Leonard was found not guilty on the sole money laundering offense with which he was charged. Employees of the operation, Kelley and McCracken, contested all the fraud and money laundering offenses with which they were charged and, therefore, obtained a severance from Greene and Leonard and were tried before a jury. They were both convicted of conspiracy as well as wire and mail fraud. Finding no error, we affirm the convictions and sentencing decisions in every aspect.

---

[*] District Judge of the Southern District of Texas, sitting by designation.

# I.

## BACKGROUND

The scheme itself was simple. Callers, hired by Greene and Leonard, used phone lines set up in a suite of small offices in the Houston area to contact elderly citizens located across the country and inform them that their names had been selected by a committee to receive one of four awards. These individuals, whose identities had been purchased from a mail order company, were read to from a pre-designed script and told that they had already been chosen to receive either first prize of $15,000.00 cash; second prize consisting of a diamond and sapphire pendant; third prize which was a large-screen Sony television; or, fourth prize consisting of $1,000.00 cash. The pendant, the only prize ever given out, was designated as second prize so that the victim would think it the second-most valuable item after the $15,000.00. In fact, a portion of the script anticipated questions as to the value of the pendant and was designed to mislead the person to believe that the jewelry, later appraised for $15.00, was worth between $2,000.00 and $2,500.00. To obtain the prize, the victim was informed that he or she had to pay $395.50. This money, the listeners were told, was for "promotional fees," "shipping and handling," "registration and processing," and "buying soap."[*] To reduce the chances of the victim's changing his or her mind, or a

---

[*] At this point in the phone call, when a victim was about to be hooked, a person called a "closer" would take over from the initial caller. Closers met alone on occasion with Leonard and Greene to receive a larger share of the victims' money than did the callers.

family member's coming home and extinguishing the deal, Federal Express was dispatched to pick up the $395.50 check shortly after the phone call.

In fact, there was no contest, there was no drawing, there was no committee, and the victims had not sent in entry cards to which the script referred. The scheme also included a follow-up letter to the victim referring to the phone call and repeating the "good news" that a prize had been won. This letter was designed to lull the victim into a sense of satisfaction with the contest. Later, a box of cheap cosmetics was delivered to the victim for the same purpose. No one ever received anything other than a $15.00 pendant. In effect, the victims each bought a $15.00 pendant for almost $400.00. By the time the FBI executed a search warrant at the office of Promotional Advertising Concepts, the business name of the operation, the scheme had reeled in 497 victims and grossed close to $200,000.00.

## II.

### DISCUSSION

#### A. Greene

Greene first contends that the district court violated his constitutional rights by considering evidence in his bench trial which was admitted during the jury trial of Kelley and McCracken. Greene suggests that the district judge promised he would not consider evidence that he had heard during the jury trial of the severed codefendants. A fair reading of the exchange between counsel and the court indicates, however, that what was

4

really contemplated was a "divorce" between the trials on the merits and not a complete ban for sentencing purposes. Nothing in the record suggests that the district court considered any evidence from the first trial in its determination of Greene's guilt of money laundering.

Further, at sentencing, Greene did not object to the court's observations concerning the elderly victims who testified at the first trial, so he must now establish "plain error." United States v. Bullard, 13 F.3d 154, 159 (5th Cir. 1994). This he cannot do. To resolve a dispute at sentencing, the district court may consider non-admissible "relevant information" provided that it "has sufficient indications of reliability." U.S.S.G. § 6A1.3(a); United States v. Burmea, 30 F.3d 1539, 1576 (5th Cir. 1994). Testimony under oath observed by the district court would qualify.

United States v. Smith, 13 F.3d 860 (5th Cir. 1994), is not to the contrary. Although this court vacated a sentence where the court considered of factual matters contained in a co-defendant's pre-sentencing report, the Smith court premised its concern on the defendant's lack of opportunity to "see" the PSR or "contest [its] accuracy." Id. at 867. In contrast, once the court reported his observations of the elderly witnesses to defendant at the sentencing hearing, Greene could have attempted to rebut the court's impressions, or at least asked for some time to do so.

Greene also contends the district court erred in sentencing him under the money laundering guidelines instead of the fraud guidelines. The crux of Greene's argument is that while

5

convicted of laundering "only" $3,638.78, compared to a fraud scheme that grossed nearly $200,000.00 and victimized at least 497 people, he was, nevertheless, sentenced under the "stiffer" money laundering guidelines. Indeed, a substantial disparity does exist between the guideline range Mr. Greene would have confronted under the fraud guidelines of § 2F1.1 and the sentence he actually received under the money laundering terms found in U.S.S.G. § 2S1.1.[**]

Greene explicitly analogizes his situation to the facts of United States v. Skinner, 946 F.2d 176, 179 (2nd Cir. 1991), where the court vacated sentences calculated under the money laundering guidelines for $3,320 of expenditures because the essence of the crime was the conspiracy and distribution of cocaine. Unfortunately for Greene, the Second Circuit remanded to the district court for reconsideration of a downward departure. Id. at 180 ("The financial transactions...can only be said to have facilitated additional crimes in the most minimal sense. Accordingly, appellants' conduct was both atypical of the conduct described by the Sentencing Guidelines and inadequately considered by the Sentencing Commission, thus empowering the district court to

---

[**] In Mr. Greene's view, the laundering guideline linguistically applies, but his conduct differs significantly from the norm. He therefore claims he is not a "normal" money launderer within the "heartland" understanding of the term but instead just a convicted "garden variety" telemarketer. Notably, however, Greene failed to file a motion challenging the legal basis or sufficiency of the evidence supporting his conviction for money laundering. Obviously not every dollar spent in every transaction that can be traced to a specified criminal activity violates 18 U.S.C. § 1956(a)(1)(A)(i). "To so interpret the statute" would "convert the money laundering statute into a money spending statute." United States v. Sanders, 928 F.2d 940, 944 (10th Cir.), cert. denied, 502 U.S. 845 (1991). See also Note, A Full Laundering Cycle is Required: Placing Back the Proceeds to Carry on Crime is the Crime under 18 U.S.C. § 1956(a)(1)(A)(i), 70 Notre Dame L. Rev. 727, 891 (1995).

consider a downward departure.")  In the Fifth Circuit, the decision not to depart is unreviewable on appeal.  <u>United States v. Miro</u>, 29 F.3d 194, 198-199 (5th Cir. 1994).[3]  In fact, this court lacks jurisdiction over a district court's refusal to grant a downward departure.  <u>United States v. DiMarco</u>, 46 F.3d 476, 477 (5th Cir. 1995) (failure to grant discretionary downward departure is "not subject to appellate review").[4]  Although, in accord with <u>Skinner</u>, the district court may effectuate the "heartland" language of the introductory chapter of the Sentencing Guidelines through the vehicle of a downward departure, its decision not to depart downward is conclusive.

Indeed, because of the Guideline's grouping rules, where money laundering and fraud offenses can be properly grouped, the imposition of the higher base offense level attached to money laundering was required.  Greene, not surprisingly, insists that the grouping of the money laundering counts of conviction with those of conspiracy, mail and wire fraud, and the false name counts was error.  The issue of grouping counts for sentencing purposes is generally a question of law subject to a <u>de novo</u> review.  <u>United States v. Patterson</u>, 962 F.2d 409, 416 (5th Cir. 1992).  The sentence will be upheld if it was imposed as the result of "a correct application of the guidelines to factual findings which are

---

[3]     We have suggested, however, "that a remand might be appropriate when the record reveals that the sentencing judge erroneously believed that it lacked the authority to depart."  <u>Id</u>. at 199 n.3.

[4]     Interestingly, in <u>DiMarco</u> we noted that the Second Circuit had adopted a similar rule.  <u>Id</u>. at 477 (citing <u>United States v. Adeniyi</u>, 912 F.2d 615, 619 (2nd Cir. 1990)).  The court in <u>Skinner</u> did not discuss the apparent conflict.

not clearly erroneous."  United States v. Ponce, 917 F.2d 841, 842 (5th Cir. 1990)(citing United States v. Sarasiti, 869 F.2d 805, 806 (5th Cir. 1989)).

Grouping by virtue of § 3D1.2(d) of the Sentencing Guidelines necessitates offenses involving the same victim and involving multiple acts tied together by a common illegal objective or part of a common scheme.  When this predicate is satisfied, § 3D1.2(d) explicitly provides for grouping of offenses covered by the fraud and money laundering guidelines.  Undoubtedly, this scam did involve several transactions as part of a larger common plan. The more difficult issue, however, is whether the fraud and money laundering offenses involved the same victim.  Greene points to several cases in support of his argument that fraud and money laundering do not involve the same victim.  See United States v. Johnson, 971 F.2d 562, 576 (10th Cir. 1992) (vacating grouping of fraud and laundering counts); United States v. Lombardi, 5 F.3d 568, 570 (1st Cir. 1993)("society" is victim of money laundering); United States v. Taylor, 984 F.2d 293, 303 (9th Cir. 1993)(vacating grouping of fraud and laundering counts).  Additionally, this court in United States v. Gallo, 927 F.2d 815, 824 (5th Cir. 1991), accepted the argument that laundering was a  crime in which society at large is the victim.[5]

---

[5]        Interestingly, in Gallo the United States "argue[d] that drug-related offenses and the money laundering offense invoke distinct societal interests." The government defined the harm from money laundering to be the "dispers[ion] of capital from lawfully operating economic institutions to criminals in and out of the country."  Id.  Because Gallo involved drug offenders and not fraud, the United States avoids, technically perhaps, inconsistency in its arguments before this court.

We distinguish this case from those cited by Greene because in none of those cases did the money laundering activities of the defendants perpetuate the underlying crimes. Here, however, Greene's money laundering activity, regardless of its limited extent, advanced the mail and wire fraud scheme that victimized nearly 500 people. We follow the approach adopted in <u>United States v. Cusumano</u>, 943 F.2d 305, 312-313 (3rd Cir. 1991), where the defendant was convicted of theft and bribery from an employee health fund as well as money laundering. The Third Circuit considered the propriety of grouping the offenses by inquiring whether the money laundering convictions and embezzlement offenses harmed the same victim. It concluded that the victim of the embezzlement offenses, as well as the laundering offenses, was "the fund and its beneficiaries." <u>Id</u>. at 313. The court concluded that these offenses were "part of one overall scheme to obtain money from the fund and convert it to the use of Cusumano." <u>Id</u>.

Similarly, the money laundering offense was not "ancillary" here. There was a single, integrated scheme to obtain money from the elderly victims and to use that money to facilitate the continuance of the scam. The activities can not be neatly separated as Greene would hope. By conducting financial transactions--paying callers, purchasing leads, paying phone bills--with the victims' money for the purpose of bilking more people out of $395.50 each, the group of targeted victims became the victim of the money laundering activity as well as the fraud scheme. In this case, the district court properly found that the money laundering

9

and fraud constituted part of the same continuing common criminal endeavor.

Greene further attacks his sentence by alleging that the district court, without explanation, sentenced him to sixty months on the fraud counts whereas a proper application of the guidelines called for a sentence of between 21 and 27 months. U.S.S.G. § 5G1.2(b), however, provides that in cases involving multiple sentences, each sentence should equal the "total punishment." As the district court was entitled to sentence pursuant to the money laundering guidelines, the imposition of 60-months for each fraud count is permitted. United States v. Porter, 909 F.2d 789, 797 n.3 (5th Cir. 1990)(in multiple-count sentences, to the extent possible without exceeding statutory maximum or minimums, the sentence on each count shall be equal to the total punishment).

Greene additionally contends that the court erred by enhancing the offense level for his role in the scheme as an organizer, pursuant to U.S.S.G. § 3B1.1(a), because the adjustment applies to the fraud offenses and not the money laundering counts. And, while Greene does not contend that the evidence is insufficient to support the factual finding that he was the organizer of the criminal activity involving numerous participants, he repeats his contention that the money laundering counts cannot be grouped with the fraud counts, and, thus, the enhancement was improper. We are unpersuaded that the grouping was unauthorized.

With greater cogency, Greene argues the four level "role in the offense" adjustment, which would apply as an enhancement to

10

Greene's fraud, should not have been added to the money laundering offense level.[6] The United States defends this increased sentence on several grounds, but the most persuasive basis seems to be § 1B1.3(a)(2). The provision permits consideration of "all acts and omissions that were part of the same course of conduct or common scheme or plan as the offense of conviction" where grouping has occurred. Greene's fraud and money laundering were properly grouped, and the money laundering was an integral factor in keeping the telemarketing scheme afloat. It was appropriate factually and legally under this guideline to apply the fraud-related role in the offense enhancement to the money laundering base offense level.

Greene, who was awarded a two-level decrease in his sentence pursuant to U.S.S.G. § 3E1.1(a), over the government's objection, argues that he was entitled to a three-level decrease. This court reviews determinations regarding acceptance of responsibility "for clear error but under a standard of review even more deferential than a pure 'clearly erroneous' standard." United States v. Gonzales, 19 F.3d 982, 983 (5th Cir. 1994).

Greene suggests that he should have received the additional one-level reduction because he waived a jury trial and wanted to stipulate to most of the evidence. This claim is without merit for a couple of reasons. First, § 3E1.1(b) makes it clear that the defendant must timely notify the government of an intention to plead guilty, not of an intention to seek a bench

_____

[6] With a zero criminal history, the adjustment increases the midpoint of Greene's guideline range sentence by 1/2 years.

trial or to stipulate to certain facts. Second, the fact that Greene informed the government of his intention to plead guilty to the fraud charges does not mitigate the expenditure of resources that it required to prosecute the money laundering charges. Gonzales, at 983-984. Accordingly, the court's refusal was proper.

### B. McCracken and Kelly

Appellants McCracken and Kelley assert that the evidence was insufficient to maintain their convictions for conspiracy and fraud. Specifically, both insist that the evidence was insufficient to establish the element of knowledge or intent. With respect to the conspiracy charges, the government must prove beyond a reasonable doubt that the defendant knowingly joined a conspiracy and that at least one conspirator committed an overt act in furtherance of the conspiracy. United States v. Cavin, 39 F.3d 1299, 1305 (5th Cir. 1994). A defendant's knowing involvement in a conspiracy can be established by circumstantial evidence. United States v. Casilla, 20 F.3d 600, 603 (5th Cir. 1994). Once a conspiracy is established, only "slight evidence" is needed to connect a defendant to the agreement. United States v. Duncan, 919 F.2d 981, 991 (5th Cir. 1990).

The government must prove beyond a reasonable doubt that the defendant had a "conscious knowing intent to defraud." United States v. Kreimer, 609 F.2d 126, 128 (5th Cir. 1980). In other words, it must prove that the defendant contemplated or intended some harm to the property rights of the victim. United States v. Stouffer, 986 F.2d 916, 922 (5th Cir.), cert. denied, 114 S.Ct. 115

12

(1993). If Kelley and McCracken knowingly joined the conspiracy and scheme to defraud, they are guilty of the substantive mail and wire fraud offenses. United States v. Basey, 816 F.2d 980, 997 (5th Cir. 1987).

It is readily apparent that these convictions are supportable. Both Kelley and McCracken worked longer at PAC than any other employees; they both worked as closers and helped train the less experienced callers; and, they attended the same meetings as the callers who realized PAC was a fraud. Particularly persuasive are the individual comments made by the two that *they* knew to be false: (1) McCracken told Mr. and Mrs. Keister that they had won $15,000.00 and that the $395.00 was for shipping and handling; (2) McCracken told Mr. Race that she had his entry card in front of her, he had been selected to win $15,000.00, and she would lose her job if he did not give his check to Federal Express; (3) Kelley gave Ms. Russell the impression she had won $15,000.00; (4) Kelley told Ms. Faust that she had won at least $1,000.00 and that her prize would be identified the next day during a committee meeting; and, (5) Kelley told Ms. Cash her name had been drawn and the least she would win was $1,000.00. Kelley and McCracken knowingly joined the scheme and conspiracy and were vicariously liable for all the substantive offenses made pursuant to it.

### C. All Four Appellants

All four appellants contend that the two level enhancement of their sentences pursuant to U.S.S.G. § 3A1.1 was improper as the victims in this case were not "vulnerable" within

13

the meaning of the guidelines. The burden is upon the government to establish the facts necessary to support the adjustment by a preponderance of the evidence. United States v. Kim, 963 F.2d 65, 69 (5th Cir. 1992). The finding of the district court is reviewed under the clearly erroneous standard. United States v. Brown, 7 F.3d 1155, 1159 (5th Cir. 1993).

Here an adequate factual basis existed for determining that the telemarketing scheme preyed upon vulnerable victims. Noting that a group of individuals *can* be found to be vulnerable under U.S.S.G. § 3A1.1, the district court concluded that PAC specifically and intentionally targeted elderly citizens because they were unusually vulnerable or particularly susceptible to this type of fraud.

We cannot find clear error in concluding on this record that these defendants intentionally selected their elderly victims because of their perceived vulnerability. In fact, all defendants *were* aware that the elderly were directly targeted by PAC. For example:

    a. Greene told a caller that they were running a "senior citizens' contest;"

    b. Leonard told callers in a morning meeting that elderly people were the "target audience" and that they had nothing better to do than send in puzzle contests;

    c. Greene purchased the names and addresses of 1,000 women who were over the age of sixty;

    d. Kelley told a caller that the victims were "old buzzards" who did not know what to do with their money;

    e. McCracken referred to the victims as "stupid old fools;"

14

f. Questionnaires received by the FBI from 252 of the 497 victims disclosed that 75% of those responding were over sixty, and the largest representative age group of the respondents was between the ages of seventy and seventy-nine.

Moreover, the evidence demonstrated that it was not a fortuitous decision to target those elder citizens. Compare United States v. Wilson, 913 F.2d 136, 138 (4th Cir. 1990)(randomly selected targets for phone fraud not vulnerable).

The evidence available also supports a finding that the elderly were unusually vulnerable or particularly susceptible to the fraud perpetrated by the conspirators in this case and that Greene, Leonard, Kelley, and McCracken specifically targeted them as a group because of this characteristic. In this regard, the district court considered Kelley's statement that, "these old buzzards don't really know what they want to do with their money;" Leonard's belief that getting the victims to send in their money was, "easy cash;" and callers' testimony that the elderly were easier to sell to than the others.[7]

## CONCLUSION

For the foregoing reasons, we **AFFIRM** the convictions and sentencing decisions in every aspect.

---

[7] Leonard, in a pro se brief, attacks the constitutionality of the search of his truck by one of his callers, alleging that she was actually an agent of the government. This contention has been waived by his entry of a guilty plea. Tollett v. Henderson, 411 U.S. 258, 267, 93 S. Ct. 1602, 1608 (1973); United States v. Smallwood, 920 F.2d 1231, 1240 (5th Cir. 1991).

15