**IN THE UNITED STATES COURT OF APPEALS**
**FOR THE FIFTH CIRCUIT**

_____

No. 01-20222
_____

UNITED STATES of AMERICA,

Plaintiff-Appellee,

versus

JOSEPH CHIKE AGHOLOR,

Defendant-Appellant.

_____

Appeal from the United States District Court
for the Southern District of Texas
(H-00-CR-440)
_____

March 25, 2002

Before KING, Chief Judge, and REAVLEY, and WIENER, Circuit
Judges.

PER CURIAM[*]:

Defendant-Appellant Joseph Chike Agholor appeals the district

court's grouping of his guilty-plea convictions for sentencing

purposes.  Concluding that, pursuant to U.S.S.G. § 3D1.2, the

district court committed plain error in its sentencing calculation

and that it erred in grouping Agholor's convictions into five

separate groups, we vacate and remand for resentencing consistent

---

[*]  Pursuant to 5th Cir. R. 47.5, the court has determined that
this opinion should not be published and is not precedent except
under the limited circumstances set forth in 5th Cir. R. 47.5.4.

with this opinion.

## I.

### FACTS AND PROCEEDINGS

Agholor pleaded guilty to a seven count indictment charging him with one count of illegal re-entry, one count of unlawful procurement of naturalization, three counts of making false statements in passport applications, and two counts of fraud in connection with identification documents: (1) Count 1 for illegally reentering the United States in 1993 under the name Prince J. Agholor, in violation of 8 U.S.C. § 1326; (2) Count 2 for unlawfully procuring naturalization in 1996 under the name Prince J. Agholor, in violation of 18 U.S.C. § 1425(b); (3) Count 3 for fraudulent application for a passport in 1996 under the name Prince J. Agholor, in violation of 18 U.S.C. § 1542; (4) Count 4 for fraudulent application for a passport in 1998 under the name Lawrence Burton, in violation of 18 U.S.C. § 1542; (5) Count 5 for use of false identification to procure a passport under the name Lawrence Burton, in violation of 18 U.S.C. § 1028(a)(4); (6) Count 6 for fraudulent application for a passport in 1998 under the name Bernard J. Jackson, in violation of 18 U.S.C. § 1542; and (7) Count 7 for use of false identification to procure a passport under the name Bernard J. Jackson, in violation of 18 U.S.C. § 1028(a)(4).[1]

---

[1]  Burton and Jackson are real persons; Prince J. Agholor is an alias of the defendant's creation.

2

Based on his guilty-plea convictions and past criminal history, the Presentence Report (the "PSR") calculated Agholor's Criminal History Category ("CHC") as III and his base offense level as 12. The probation officer arrived at this offense level by using the base offense level of 8 for unlawfully entering the country.[2] He then added 4 levels for Agholor's specific offense characteristic —— namely, Agholor's illegal re-entry after having been previously deported for committing a felony.[3] The PSR noted that, although there were multiple conviction counts, all counts were grouped together pursuant to U.S.S.G. § 3D1.2(b) and that only the offense level for the violation with the highest base level (here, illegal re-entry) would be used.

The government filed multiple objections to the PSR's recommended grouping of all seven counts into a single category. The government argued that corralling all of the offenses into one group severely misrepresented Agholor's criminal conduct and that Agholor's theft of two identities to obtain three passports under three aliases necessitated separate groups. The probation officer consistently maintained, however, that all of Agholor's offenses implicated the same societal harms, criminal objective, and victim, and therefore should be grouped together.

The district court rejected the PSR's recommendation and

---

[2] U.S.S.G. § 2L1.2(a).

[3] U.S.S.G. § 2L1.2(b)(1)(D).

devoted nearly all of the sentencing hearing to a discussion of the grouping. Initially, the district court appeared to consider the option of placing Count 1 (illegal re-entry) in one group, Count 2 (unlawful naturalization procurement) in a second, Counts 3, 4, and 6 (the fraudulent passport applications) in a third group, and Counts 5 and 7 (use of false identification) in a fourth. The government urged that Counts 3, 4, and 6 should not be grouped together because three identities were used and because Lawrence Burton and Bernard Jackson were two separate and identifiable victims. The court then entered into an extended colloquy with defense counsel regarding whether all the offenses should be placed into one group. In the end, the court agreed with the government and rejected defense counsel's contention that all of Agholor's crimes had the same victim —— namely, society as a whole.

The district court coupled the false identification convictions with their respective passport application convictions and settled on the following five groups: (1) Count 1; (2) Count 2; (3) Count 3; (4) Counts 4 and 5; (5) Counts 6 and 7. Based on these five groups, the district court, on the advice of the probation officer, added 5 levels to the offense level of 12 to arrive at an offense level of 17. The district court sentenced Agholor to 37 months imprisonment, the maximum sentence for the Guidelines range of 30-37 months for an offense level of 17 and a CHC of III.

Agholor timely appealed his sentence. He contends that (1)

4

society at large is the only victim of his crimes and hence the violations should be conglomerated into one group; (2) at most, his violations should be separated into three groups; and (3) the district court plainly erred in calculating his combined offense level at 17.

## II.

### ANALYSIS

**A.  Standard of Review**

The district court's decision to group counts together for sentencing purposes vel non is a question of law that we review de novo.[4]  The government concedes that Agholor's contention that his crimes should fall into one group is reviewed de novo; however, the government asserts that because Agholor never raised the alternative argument that his convictions should at most be separated into three groups, we should review that issue for plain error.  We disagree.  Having adequately raised the general issue of grouping during sentencing, and given this court's de novo review of the district court's grouping decision, it is unduly rigid to require Agholor to raise every other possible grouping permutation to preserve those arguments for appeal.  Therefore we review the

---

[4]  United States v. Leonard, 61 F.3d 1181, 1185 (5th Cir. 1995) ("The issue of grouping counts for sentencing purposes is generally a question of law subject to de novo review.  The sentence will be upheld if it was imposed as a result of a correct application of the guidelines to factual findings which are not clearly erroneous.") (citations and internal quotations omitted).

5

entire issue of grouping, with all of its possible combinations, under our de novo standard.

## B. Grouping of Agholor's Convictions

### 1. Same Victim

Citing U.S.S.G. § 3D1.2(b), Agholor contends that all his convictions should be grouped together. Section 3D1.2(b) states, in relevant part:

> **Groups of Closely Related Counts**
> All counts involving substantially the same harm shall be grouped together into a single group. Counts involve substantially the same harm within the meaning of this rule:
> ...
> (b)    When counts involve the same victim and two or more acts or transactions connected by a common objective or constituting part of a common scheme or plan.

Application Note 2 to this guideline rule clarifies:

> 2.    The term "victim" is not intended to include indirect or secondary victims. Generally, there will be one person who is directly and most seriously affected by the offense and is therefore identifiable as the victim. For offenses in which there are no identifiable victims (e.g., drug or immigration offenses, where society at large is the victim), the "victim" for purposes of subsections (a) and (b) is the societal interests that are harmed. In such cases, the counts are grouped together when the societal interests that are harmed are closely related. Where the count, for example, involves unlawfully entering the United States and the other involves fraudulent evidence of citizenship, the counts are grouped together because the societal interest harmed (the interest protected by law governing immigration) are closely related. In contrast, where one count involves the sale of controlled substances and the other involves an immigration law violation, the counts are not grouped together because different societal

6

> interests are harmed. Ambiguities should be resolved in accordance with the purpose of this section as stated in the lead paragraph, ie., to identify and group "counts involving substantially the same harm." (emphasis added).

Grounded in these provisions, Agholor's basic contention is that his crimes of illegal re-entry, fraudulent procurement of naturalization, and fraudulent passport applications are immigration crimes, and that all have the same victim — society at large. Arguing that all the statutes relevant here protect the integrity of the country's borders and are designed to regulate residence within, and travel outside, the United States, Agholor insists that the interests at stake, although not identical, are closely related, as required by the guideline application note.

The government asserts in response that, even though society at large is generally the victim of these offenses, Agholor's crimes have distinct and separate victims. The government contended, and the district court agreed, that the use of Burton's and Jackson's identities made them individualized victims of the passport and identification fraud counts. The government argues to us that the district court's finding that Burton and Jackson were victims is a factual finding and thus cannot be reversed unless it is clearly erroneous. Even if this is so, it is irrelevant because the larger question is whether the district court may, as a matter of law, properly consider individuals as "victims" in the context of U.S.S.G. § 3D1.2.

Agholor's argument that there can be no identifiable victims

7

for these types of immigration crimes finds support in United States v. Lara.[5]  In Lara, the district court granted an upward departure pursuant to 5K2.3 ("Extreme Psychological Injury") for a defendant convicted of various counts of harboring and transporting illegal aliens.  Discussing whether the psychological damage inflicted on an individual illegal alien was a permissible factor for upward departure, a panel of this court noted:

> At the outset, application of section 5K2.3 to the instant offense would appear to be barred by the statement in application note 2 to section 3D1.2 that, in the case of an immigration offense, there is no identifiable victim.[6]

Ultimately, however, the panel decided the issue on insufficiency of the evidence of harm rather than on the legal applicability of individualized harm during an immigration offense.

Under the discrete facts of this case, we need not consider the larger question whether individuals can ever be the identifiable victims of immigration crimes.  Even assuming arguendo that in the instant situation immigration crimes could have identifiable victims, Burton and Jackson were at most "indirect or secondary victims" as contemplated by the application note to § 3D1.2(b).  Thus, for purposes of this case, we conclude that the only relevant victim of Agholor's crimes was society at large. Having so concluded, we must decide next whether the societal harms

---

[5]  975 F.3d 1120 (5th Cir. 1992).

[6]  Id. at 1127.

8

implicated by Agholor's crimes were "closely related."

B. **Closely Related Interests**

The cases cited by the government in its brief are not instructive on the precise question whether illegal re-entry, unlawful procurement of naturalization, and passport application fraud implicate closely related societal interests.[7] Although it seems clear, for example, that the societal interests affected by illegal re-entry and illegal firearm possession are distinct (i.e., enforcing immigration laws versus protecting society from those deemed unqualified to possess firearms), it is not at all clear that re-entry, naturalization, and passport violations reach a sufficient level of separateness to avoid classification as closely related interests.

Undaunted, the government insists that Agholor's offenses implicate distinct societal interests and cannot all be classified as "immigration" violations. The government's argument is not wholly persuasive for at least four reasons. First, the nature of the societal interests at stake can always be manipulated and defined at various levels of specificity or abstraction. For

_____

[7]  See United States v. Packer, 70 F.3d 357 (5th Cir. 1996) (no plain error in district court's finding that different interests were implicated by passport fraud, structuring financial transactions, concealing an individual from arrest, and social security and mail fraud); United States v. Gallo, 927 F.2d 815 (5th Cir. 1991) (societal interests harmed by drug trafficking and money laundering not closely related); United States v. Salgado-Ocampo, 159 F.3d 322 (7th Cir. 1998) (convictions for illegal re-entry and illegal alien in possession of a firearm could not be grouped).

9

example, the PSR viewed all of Agholor's crimes as implicating the same or similar societal interest —— specifically, "[t]his defendant's criminal objective was to violate the laws governing immigration in order to be able to live within the United States and have the ability to travel outside the United States." Nevertheless, the government's decision to define the societal interests for each of Agholor's violations narrowly cannot substitute as the basis of a legal standard on which this case should be decided.

Second, the guidelines do <u>not</u> require that the crimes implicate the <u>same</u> societal interests; only that the interests be "closely related." Third, the structure of the guidelines indicates that illegal re-entry, naturalization, and passport violations are indeed closely related: The sentencing for all three types of violations are agglomerated in Chapter 2, Part L, under the title "Offenses Involving Immigration, Naturalization, and Passports."[8]

Finally, the guidelines contemplate the grouping of illegal re-entry convictions with naturalization or passport fraud under particular circumstances. Clarifying U.S.S.G. § 2L2.2, the Sentencing Guideline for fraudulently acquiring naturalization or a passport, the Application Notes read, in relevant part:

---

[8] The Application Notes to the guidelines in that section also state "'Immigration and naturalization offense' means any offense covered by Chapter Two, Part L." <u>See</u>, <u>e.g.</u>, U.S.S.G. § 2L2.1, n. 1.

10

1.   For purposes of this guideline—
     "Immigration and naturalization offense" means any
     offense covered by Chapter Two, Part L.
2.   For the purposes of Chapter Three, Part D (Multiple
     Counts), a conviction for unlawfully entering or
     remaining in the United States (§ 2L1.2) arising
     from the same course of conduct is treated as a
     closely related count, and is therefore grouped
     with an offense covered by this guideline.[9]

Importantly, this guideline section not only indicates the close relationship of the societal interests harmed by Agholor's offenses, but also calls into question the district court's division of Counts 1, 2, and 3 into separate groups.

Given the structure of the Guidelines and the implication of the application notes, we are satisfied that the societal interests implicated by Agholor's conduct are sufficiently "closely related" to require them to be classified as such.

## C.   Common Criminal Objective/Common Scheme or Plan

When, as here, the convictions involve (1) the same victim, (2) closely related societal interests, and (3) two or more acts or transactions, the grouping of the crimes requires that they be "connected by a common criminal objective or constitut[e] part of a common scheme or plan."[10]  As with the other questions presented, otherwise controlling case law does not shed much light on the issue of what constitutes a common criminal objective or a common scheme or plan.

---

[9]  U.S.S.G. § 2L2.2, n. 1-2.

[10]  U.S.S.G. § 3D1.2(b) (emphasis added).

These elastic grouping standards could lead to a variety of grouping combinations. Given the conclusions reached in our foregoing discussion, however, we are convinced that from most legal vantage points, this question is best answered with the conclusion that Agholor's crimes should be divided into three groups.

Segregating Agholor's crimes into three groups is justified under several different rationales. To our way of thinking, the most prudent approach under these facts is to view Agholor as having engaged in three sets of transactions. The first set encompasses Counts 1, 2, and 3, starting with his illegal re-entry into the United States, followed by his procurement of naturalization and his application for a passport, all under the pseudonym of Prince J. Agholor.[11] The second set of transactions encompasses Counts 4 and 5 and includes Agholor's use of false identification and application for a passport under the name Lawrence Burton. The third set of transactions encompasses Counts 6 and 7 and includes his use of false identification and application for a passport under the name Bernard Jackson.

This grouping methodology is consistent with our conclusions that (1) either the crimes here have no identifiable victims or the alleged victims are secondary at most, and (2) Agholor's crimes

---

[11] This grouping of these three counts further supported by Application note 2 to § 2L2.2. See supra note 9 and accompanying text.

implicate closely related interests.  In addition, this methodology jibes with the district court's statement during sentencing that Agholor's passport applications under three different names probably indicates distinct criminal objectives.

Although we believe this to be the most cogent analysis, we hasten to note that at least two other rationales support separation into three groups: a temporal assessment and a victim-specific approach.  Temporally, Agholor's crimes separate into three groups based on the timing of his activities: (1) He illegally re-entered the United States in 1993; (2) he procured naturalization and applied for a passport under the name Prince J. Agholor in late 1996; and (3) he used false identifications to apply for passports under the names Lawrence Burton and Bernard Jackson in March and April of 1998.  Thus, a straightforward but simplistic temporal analysis would lead to the grouping of Count 1 by itself, Counts 2 and 3 together, and Counts 4, 5, 6, and 7 together — different combinations but three groups nonetheless. Under other circumstances a temporal assessment might be a more viable and prudent approach than it is here.

And, even if we were to have held that immigration crimes could have separately identifiable, individual victims, and that, in this case, Burton and Jackson were primary, as opposed to incidental or secondary victims, we would still divide Agholor's crimes into three groups:  (1) Counts 1, 2, and 3 for harming society under the alias Prince J. Agholor; (2) Counts 4 and 5 for

13

harming Lawrence Burton; and (3) Counts 6 and 7 for harming Bernard Jackson.

With the multitude of possible combinations and permutations in this aspect of sentencing, we refrain from mandating any one manner of grouping counts for sentencing purposes. As is typical of many features of the Sentencing Guidelines, grouping is a "slides and ladders" operation that ultimately must be resolved on a case-by-case basis. Each situation will be highly dependent on its discrete facts, which sentencing courts should consider in connection with the Sentencing Guidelines as a whole and with the accompanying application notes. As the case before us amply demonstrates, there is no obvious, "right" methodology, and we assiduously avoid any implication that there is.

## C. **Plain Error in Offense Level Calculation**

Agholor also argues that the district court erred when it added 5 offense levels to his base offense level of 12. As Agholor did not raise this objection during the proceedings in district court, we review it for plain error.[12] We agree with Agholor that the district court's error in this regard is plain,[13] because the

---

[12] United States v. Martinez-Cortez, 988 F.2d 1408, 1410 (5th Cir. 1993) ("When a new factual or legal error is raised for the first time on appeal, plain error occurs whe[n] our failure to consider the question results in manifest injustice.") (citations and internal quotations omitted).

[13] The government also concedes that the district court erred when it added 5 levels instead of 4.

14

relevant guideline provision clearly states that when the number of groups is 3 ½ to 5, the offense level should be increased by 4 levels, not 5 as imposed by the district court.[14]

Given our conclusions regarding the grouping of Agholor's convictions and our remand on that issue, however, this point of error is moot. After Agholor's convictions are divided into three groups on remand, his base offense level must be increased by 3 levels, bringing his total offense level to 15. With Agholor's CHC of III and an offense level of 15, the applicable guidelines sentencing range is 24 to 30 months imprisonment. That will be the starting point for the sentencing court on remand.

### III.

### CONCLUSION

For the foregoing reasons, we vacate Agholor's sentence and remand this case to district court for sentencing consistent with this opinion.

VACATED and REMANDED.

---

[14] U.S.S.G. § 3D1.4.