USCA1 Opinion

 

 UNITED STATES COURT OF APPEALS FOR THE FIRST CIRCUIT _________________________ No. 94-1122 UNITED STATES OF AMERICA, Appellee, v. ANTHONY L. TALLADINO, Defendant, Appellant. _________________________ APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF MASSACHUSETTS [Hon. Robert E. Keeton, U.S. District Judge] ___________________ _________________________ Before Selya, Circuit Judge,  _____________ Coffin, Senior Circuit Judge, ____________________ and Stahl, Circuit Judge. _____________ _________________________ Susan K. Howards, with whom Launie and Howards P.A. was on ________________ _______________________ brief, for appellant. Dina Michael Chaitowitz, Assistant United States Attorney, ________________________ with whom Donald K. Stern, United States Attorney, was on brief, _______________ for appellee. _________________________ November 14, 1994 _________________________ SELYA, Circuit Judge. This appeal constitutes one more SELYA, Circuit Judge. _____________ link in the lengthening chain of sentencing appeals that binds the federal courts of appeals ever more tightly to the sentencing process. In this instance, defendant-appellant Anthony L. Talladino challenges the district court's determination of the guideline sentencing range (GSR) in respect to: (1) the court's enhancement of his offense level based on his aggravating role in the offense; and (2) the court's handling of the delicate interface between obstruction of justice and acceptance of responsibility. We find the first assignment of error to be unavailing. We detect some merit, however, in the second assigned error. Consequently, we vacate appellant's sentence and remand for resentencing. I. BACKGROUND I. BACKGROUND Because the underlying conviction results from a guilty plea rather than a trial, we draw the facts from the uncontested portions of the Presentence Investigation Report (PSI Report) and the transcript of the sentencing hearing. See United States v. ___ ______________ Garcia, 954 F.2d 12, 14 (1st Cir. 1992); United States v. Dietz, ______ _____________ _____ 950 F.2d 50, 51 (1st Cir. 1991). Talladino, a chemist by trade, attempted to parlay his technological expertise into ill-gotten gains by illicitly manufacturing and distributing a kaleidoscopic array of drugs, including methamphetamine, psilocybin, PHP (1-(1- 2 phenylcyclohexyl)-pyrrolidine), and MDMA (methylenedioxymethamphetamine).1 Talladino plied this nefarious trade in concert with several other persons, among them Michael Hanley, Anthony Miller, and Scott Dailey. The venture apparently took wing when, sometime in 1989, Talladino told Hanley that he (Talladino) had the skills needed to manufacture illegal drugs. Hanley expressed interest and the two men set up shop. In the fall of 1990, Talladino began manufacturing PHP at locations in Boston and Dorchester. He explained to Hanley that he had selected PHP as the product of choice because, as an analogue of PCP, it was "non-classified" under Massachusetts law and, thus, the producers "would avoid any sort of legal ramifications." Within a few months, the principals had recruited Miller and Dale McDonnell (an acquaintance of Talladino's) as retailers for the manufactured PHP. For a spell, Talladino's rodomontade seemed to be congruent with the relevant realities. In April of 1991, a local police department caught wind of a suspected PCP distribution ring. The police arrested Talladino and Miller. Once apprehended, Miller, who believed he had been trafficking in PCP, told the officers that McDonnell was peddling PCP "for Talladino." The Commonwealth of Massachusetts charged Talladino with distributing PCP, but, when chemical tests proved the  ____________________ 1Psilocybin is familiarly known as "mushrooms" or "magic mushrooms." PHP is an analogue for PCP (sometimes called "angel dust"). MDMA is generally referred to as "Ecstasy." 3 product to be PHP, the authorities dropped the charges. Talladino's luck began to sour in late 1991, when the federal Drug Enforcement Administration (DEA) launched an investigation. At that juncture, Talladino was using Hanley's residence in Quincy, Massachusetts, as a site for manufacturing PHP. A chemical company informed the DEA that Hanley, employing a pseudonym, had ordered a chemical frequently used to manufacture PCP. The DEA orchestrated a surveillance and Hanley unwittingly led the lawmen to his lodgings. Early the next morning, a Quincy police officer stopped Talladino's car and found inside a bottle containing approximately 50.50 grams of a substance that the officer thought was PCP (but which was in actuality PHP). The police arrested Talladino for possessing PCP with intent to distribute. Perhaps emboldened by his previous triumphant encounter with the law, Talladino freely admitted that he was manufacturing PHP. The state once again dismissed the charges against him, but the DEA's interest did not wane. Meanwhile, Talladino began to expand his horizons. In 1992, he proposed to Dailey, a co-worker, that they use the latter's apartment as a site for producing phenylacetic acid (a precursor chemical to methamphetamine). The men tried, but the reaction failed. The entrepreneurs shelved the plan to manufacture methamphetamine until February of 1993, when Talladino noticed that Dailey's laboratory had received a shipment of phenylacetic acid. Talladino told Dailey that it 4 would be easy to manufacture methamphetamine with pure phenylacetic acid. At Talladino's instigation, Dailey pilfered 300 grams of phenylacetic acid from his employer. Talladino then installed a production facility at Dailey's apartment. By June, the pair had succeeded in manufacturing roughly 140 grams of liquid methamphetamine. Dailey described himself as Talladino's "lab assistant" for purposes of this endeavor. Apparently not satisfied with PHP and methamphetamine, Talladino continued to enlarge his product line. Presumably because his paramour knew an individual who stood ready to buy large quantities of the drug known as Ecstasy, Talladino next focused his considerable energies in that direction. Talladino obtained a quantity of safrole (a precursor chemical), and attempted to manufacture the drug. During the same time frame, Talladino and Hanley decided to produce psilocybin, a hallucinogen. Talladino ordered the seeds, took petri dishes and other necessary paraphernalia from his place of legitimate employment, and ordered Hanley to procure lime and peat moss. The attempt to produce psilocybin was well on the way to fruition when a federal grand jury indicted Talladino.2  ____________________ 2The grand jury later returned a superseding eleven-count indictment against Talladino, Hanley, Miller, and Dailey. Count 1 charged all four men with conspiring to manufacture and distribute PHP, methamphetamine, Ecstasy, and psilocybin. The remaining ten counts charged various defendants with assorted crimes such as distributing PHP; possessing PHP and-or metamphetamine with intent to distribute; possessing listed chemicals with intent to manufacture methamphetamine and P2P (a methamphetamine precursor); attempting to manufacture psilocybin 5 DEA agents arrested Talladino and Hanley on June 3, 1993. Both men were detained. Immediately prior to Hanley's release on bail, Talladino instructed him to destroy all evidence of drug manufacture at a location the two men had used in Charlestown, Massachusetts. Hanley followed Talladino's instructions. Through an intermediary, Talladino also managed to alert Dailey to the dire nature of the situation and suggest that he take cautionary measures. As a result of the warning call, Dailey disposed of the methamphetamine and other chemicals.3 On September 17, 1993, Talladino pled guilty to the ten counts of the indictment in which he was named. The district court convened a disposition hearing on January 20, 1994.4 Dailey testified. The court also inspected transcripts of grand jury testimony, reviewed the PSI Report, and mulled Talladino's objections thereto. Two of those objections lie at the epicenter of this appeal: appellant's lament that he should not be subjected to a four-level enhancement for playing an aggravating  ____________________ and Ecstasy; and maintaining facilities for manufacturing controlled substances. See, e.g., 21 U.S.C. 841(a)(1) & ___ ____ (d)(1), 846, 856; 18 U.S.C. 2. Although all defendants were not implicated in all counts, ten of the eleven counts targeted Talladino. 3Dailey did not succeed fully in covering the conspirators' tracks. On June 5, 1993, the DEA searched Dailey's apartment and found a residue of methamphetamine and methamphetamine precursors. 4The November 1993 edition of the federal sentencing guidelines applies in this case. See United States v. Aymelek, ___ _____________ _______ 926 F.2d 64, 66 n.1 (1st Cir. 1991) ("Barring ex post facto __ ____ _____ concerns, the guidelines in effect at the time of sentencing . . . control."). All references herein are to that version. 6 role in the offense; and his contention that he should receive a three-level credit for acceptance of responsibility (as opposed to the two-level credit recommended in the PSI Report). The district court overruled appellant's role-in-the- offense and acceptance-of-responsibility objections. It then calculated the GSR at 135-168 months (offense level 33/criminal history category I) and imposed an incarcerative sentence at the bottom of the range. This appeal ensued. II. ROLE IN THE OFFENSE II. ROLE IN THE OFFENSE Appellant asseverates that the lower court erred in enhancing his base offense level for his role in the commission of the offense. We start our analysis by inspecting the legal framework on which this asseveration rests, and then proceed to examine the merits. A A The federal sentencing guidelines provide two different tiers of upward adjustments for defendants who are in the higher echelons of criminal enterprises. Generally speaking, a "manager" or "supervisor" is treated less kindly than a journeyman, but more kindly than an "organizer" or "leader." Compare U.S.S.G. 3B1.1(b) with U.S.S.G. 3B1.1(a). In the _______ ____ latter case, the guidelines call for an increase of four levels "[i]f the defendant was an organizer or leader of a criminal activity that involved five or more participants or was otherwise extensive . . . ." Id. ___ 7 It is evident from this language that the guideline puts in place two preconditions to a four-level enhancement. One is enterprise-specific; the court must find that the criminal activity involved five or more participants, or was otherwise extensive. The second is offender-specific; the court must find that a particular defendant acted as an organizer or leader of the activity. We have consistently read the guideline in this manner. See, e.g., United States v. Olivier-Diaz, 13 F.3d 1, 4 ___ ____ _____________ ____________ (1st Cir. 1993); Dietz, 950 F.2d at 52; United States v. _____ ______________ McDowell, 918 F.2d 1004, 1011 (1st Cir. 1990). ________ The commentary to the guidelines furnishes a nonexhaustive list of factors to aid courts in delineating the difference between the roles of organizer/leader and manager/supervisor: [1] the exercise of decision making authority, [2] the nature of participation in the commission of the offense; [3] the recruitment of accomplices, [4] the claimed right to a larger share of the fruits of the crime, [5] the degree of participation in planning or organizing the offense, [6] the nature and scope of the illegal activity, and [7] the degree of control and authority exercised over others. U.S.S.G. 3B1.1, comment. (n.4). These seven factors, while useful as guideposts, do not possess talismanic significance. "There need not be evidence of every factor before a defendant is found to be a leader or organizer." United States v. Preakos, ______________ _______ 907 F.2d 7, 9 (1st Cir. 1990) (per curiam) (citation and internal quotation marks omitted). Moreover, because role-in-the-offense determinations are inherently fact-specific, the district court's 8 views demand "considerable respect." United States v. Ocasio, _____________ ______ 914 F.2d 330, 333 (1st Cir. 1990). As a consequence, such judgments are reviewed on appeal only for clear error or mistake of law. See Dietz, 950 F.2d at 52; United States v. Akitoye, 923 ___ _____ _____________ _______ F.2d 221, 227 (1st Cir. 1991); McDowell, 918 F.2d at 1011; United ________ ______ States v. Diaz-Villafane, 874 F.2d 43, 48 (1st Cir.), cert. ______ ______________ _____ denied, 493 U.S. 862 (1989). ______ B B Appellant eschews any challenge to the court's determination of extensiveness (and, in all events, the record persuasively demonstrates the scope of the criminal activity and the large number of persons participating therein). Instead, appellant complains about the court's assessment of his role in the enterprise. We think that the facts, fairly viewed, verify the conclusion that appellant served as both an "organizer" and "leader" of the drug manufacturing and distribution ring. Appellant's argument, distilled to its essence, is that he and his coconspirators were equal partners embarked upon a joint venture. This self-deprecation cannot withstand the crucible of close examination. Most tellingly, the record shows with pristine clarity that appellant made the key strategic decisions for the group: what drugs would be manufactured, when the manufacturing would take place, at what locations, what processes would be used, and what quantities of contraband would be manufactured. Where, as here, one individual in a multi- defendant enterprise makes the critical strategic and operational 9 decisions on behalf of the group (unilaterally answering questions such as "what? when? where? how? and how much?"), that individual exhibits precisely the sort of characteristics that are emblematic of an organizer or leader. In this case, moreover, the record is replete with evidence that appellant not only exercised decisionmaking authority, but also did the lion's share of the planning, recruited accomplices, and exerted control over those accomplices. Indeed, appellant used Hanley and Dailey on an ongoing basis to run errands in furtherance of the project (e.g., ____ directing Hanley to obtain peat moss and lime needed for the proposed production of psilocybin; directing Dailey to filch glassware and machinery from his place of employment, and otherwise treating him as an assistant). If more were needed and we do not think that it is the events that occurred after appellant's arrest confirm his place in the conspiracy's hierarchy. While in jail, he instructed Hanley and Dailey to destroy evidence, and they complied unquestioningly with those instructions. We will not wax longiloquent. The evidence demonstrates appellant's hegemony beyond the shadow of a doubt and, thus, amply supports the district court's finding that appellant was an organizer and leader of the criminal activity. See, e.g., United States v. Fuller, 897 F.2d 1217, 1220 (1st Cir. ___ ____ _____________ ______ 1990) (holding that the four-level enhancement applies when a defendant "exercise[s] some degree of control over others 10 involved in the commission of the offense or [is] responsible for organizing others for the purpose of carrying out the crime"). C C Appellant has one more arrow in his quiver. He argues that, given the centrality of his training in chemistry to his participation in the offense, the district court erred in deciding upon a role-in-the-offense enhancement (four levels) rather than a lesser "special skill" enhancement (two levels). See U.S.S.G. 3B1.3 (providing in pertinent part for a two-level ___ enhancement if the defendant "used a special skill, in a manner that significantly facilitated the commission or concealment of the offense"). To be sure, there is some potential overlap between the special skill provision and the aggravating role adjustment. Although double counting may be permissible in certain circumstances under the guidelines, see, e.g., United States v. ___ ____ _____________ Lilly, 13 F.3d 15, 19 (1st Cir. 1994), the Sentencing Commission _____ chose to avoid it in respect to this overlap. To this end, section 3B1.3 specifically declares that a special skill adjustment "may not be employed in addition to an adjustment under 3B1.1 (Aggravating Role)." U.S.S.G. 3B1.3. Therefore, the district court could not lawfully have piled a four-level increase for role in the offense atop a two-level increase for the use of a special skill. But the district court did not run afoul of this prohibition; it unleashed only the former enhancement, not the latter. We discern no error. 11 We agree with appellant that some of the facts that demonstrate his leadership role relate to his work as a chemist. When the same set of facts implicates two different adjustment provisions, however, the guidelines ordinarily do not require a sentencing court to embrace the lesser of the two equally applicable adjustments. See, e.g., United States v. Medeiros, ___ ____ _____________ ________ 897 F.2d 13, 20 (1st Cir. 1990). In fact, the guidelines point rather conspicuously in the opposite direction. See generally ___ _________ U.S.S.G. 1B1.1, comment. (n.5) ("Where two or more guideline provisions appear equally applicable, but the guidelines authorize the application of only one such provision, use the provision that results in the greater offense level."). In this instance, the record solidly supports the district court's finding that appellant acted as an organizer and leader5 and no provision in the guidelines suggests that a sentencing court must resort to a special skill enhancement in lieu of an equally justified aggravating role enhancement. Thus, notwithstanding the imbrication of which appellant complains, the  ____________________ 5To the extent appellant argues that the sentencing court misconstrued actions he took as a chemist, his argument falls far short of the mark. Appellant was by no means an independent contractor whose authority was confined to the laboratory and whose decisions were limited to discrete issues related to production. Instead, the district court warrantably found that appellant, aided by his knowledge of chemistry and his ready access to raw materials and equipment, made a series of tactical and strategic choices for the organization on a wide-ranging basis. We must accept this rendition of the record. See United ___ ______ States v. St. Cyr, 977 F.2d 698, 706 (1st Cir. 1992) (holding ______ _______ that "when there are two plausible views of the record, the sentencing court's adoption of one such view cannot be clearly erroneous"); Diaz-Villafane, 874 F.2d at 49 (similar; discussing ______________ role-in-the-offense adjustment). 12 district court acted properly in embracing the four-level upward adjustment described in section 3B1.1 rather than settling for the two-level adjustment described in section 3B1.3.6 III. ACCEPTANCE OF RESPONSIBILITY III. ACCEPTANCE OF RESPONSIBILITY Appellant's remaining challenge concerns acceptance of responsibility. U.S.S.G. 3E1.1(a) provides for a basic two- level reduction in the offense level if a defendant accepts responsibility as that phrase is used in the guidelines. Section 3E1.1(b) makes provision for an additional one-level reduction if the defendant qualifies for the initial decrease under subsection (a), has an offense level of 16 or more, and either: "(1) timely provid[es] complete information to the government concerning his own involvement in the offense; or (2) timely notif[ies] authorities of his intention to enter a plea of guilty, thereby permitting the government to avoid preparing for trial and permitting the court to allocate its resources efficiently." U.S.S.G. 3E1.1(b). A different guideline, U.S.S.G. 3C1.1, provides for a two-level increase in the offense level for obstructing or impeding the administration of justice. A natural tension arises between these two guidelines when a defendant obstructs justice,  ____________________ 6We note in passing that the special skill provision operates differently than the abuse of trust provision contained in the same guideline. With respect to the latter, the guidelines specifically authorize the imposition of separate enhancements for both abuse of a position of trust and aggravating role, see U.S.S.G. 3B1.3, notwithstanding that the ___ two enhancements may arise out of the same nucleus of operative facts, see United States v. Hickman, 991 F.2d 1110, 1112 (3d Cir. ___ _____________ _______ 1993) (discussing operation of these interlocking guidelines). 13 yet professes to accept responsibility. In such cases, the defendant faces an uphill, but not necessarily an impossible, climb. While the Sentencing Commission recognizes that conduct requiring an enhancement under section 3C1.1 "ordinarily indicates that the defendant has not accepted responsibility for his criminal conduct," U.S.S.G. 3E1.1, comment. (n.4), it acknowledges in the same breath that there are "extraordinary cases in which adjustments under both 3C1.1 and 3E1.1 may apply." Id. ___ In the instant case, the district court invoked U.S.S.G. 3C1.1 and imposed a two-level enhancement for obstruction of justice as a result of appellant's campaign to destroy evidence. The court nevertheless found that appellant had accepted responsibility, and, although troubled by the obstruction of justice, found his case to be extraordinary. Then, without any analysis of the requirements set forth in section 3E1.1(b), the court gave appellant a two-level rather than a three-level acceptance-of-responsibility credit. The court offered no explanation of, or insight into, the source of its authority to make so Solomonic a decision.7 Cf. 2 Kings ___ _____ 3:16-18 (proposing resolution of dispute by splitting small child in half). On appeal, Talladino assails the district court's decision to deny the extra one-level reduction under section  ____________________ 7The court apparently emulated the PSI Report, which had recommended this very course. The PSI Report, too, glossed over the question of authority. 14 3E1.1(b). He contends that, once the district court determined that he qualified for the basic acceptance-of-responsibility reduction, U.S.S.G. 3E1.1(a), the court had no discretion to withhold the additional level due to obstruction of justice, but, instead, could only undertake the circumscribed inquiry limned in section 3E1.1(b), and grant or deny the further reduction solely on that basis. We agree with appellant's analysis. A A We deal first with the standard of appellate review that applies to this aspect of the case. The government importunes us to review the challenged ruling for clear error, while appellant urges us to undertake plenary review. Whether a defendant has, or has not, accepted personal responsibility is normally a fact-dominated issue, and the district court's decision to grant or withhold a reduction in the offense level on that account will not be overturned unless it can be shown to be clearly erroneous. See, e.g., United States ___ ____ _____________ v. Morillo, 8 F.3d 864, 871 (1st Cir. 1993); United States v. _______ _____________ Royer, 895 F.2d 28, 29 (1st Cir. 1990). Nonetheless, questions _____ of law including interpretive questions concerning the meaning and scope of the sentencing guidelines engender de novo review. __ ____ See, e.g., United States v. St. Cyr, 977 F.2d 698, 701 (1st Cir. ___ ____ _____________ _______ 1992); United States v. Connell, 960 F.2d 191, 197-98 (1st Cir. _____________ _______ 1992). When a sentencing court's factfinding is inextricably intertwined with an allegedly improper application of the sentencing guidelines, the latter standard of review controls. 15 See United States v. Tavano, 12 F.3d 301, 307 (1st Cir. 1993). ___ _____________ ______ In its present posture, the issue presented on appeal does not involve a factual determination under either subsection (a) or (b) of section 3E1.1.8 Instead, this case poses the quintessentially legal question of whether the district court had discretion to deny appellant the additional one-level reduction described in U.S.S.G. 3E1.1(b), without considering the timeliness of appellant's acceptance of responsibility. We, therefore, review the challenged ruling de novo. __ ____ B B As a matter of common sense, the district court's determination that, having obstructed justice, appellant deserved something less than the maximum three-level reduction for acceptance of responsibility is attractive. As a matter of law, however, the court's decision is more vulnerable, because nothing in the language of U.S.S.G. 3E1.1(b) makes any reference, veiled or otherwise, to judicial power to withhold the one-level reduction due to obstruction of justice. The language of subsection (b) is absolute on its face. It simply does not confer any discretion on the sentencing judge to deny the extra one-level reduction so long as the subsection's stated requirements are satisfied.  ____________________ 8Although the district court found as a fact that appellant accepted responsibility, U.S.S.G. 3E1.1(a), neither side has appealed from that finding. Insofar as U.S.S.G. 3E1.1(b) is concerned, the district court made no findings even though appellant's counsel argued the point both in a sentencing memorandum and in objections to the PSI Report. 16 The government argues that the district court's discretion to withhold the one-level reduction, even when a defendant has met the explicit requirements of subsection (b), is inherent in, or a necessary concomitant of, the need for the district court to find that the case is "extraordinary" a finding that is essential to overcome the effect of a defendant's obstruction of justice and remove the roadblock that otherwise bars all access to section 3E1.1. Withal, the government is wholly unable to cite to anything in the guidelines or in the Sentencing Commission's commentary that supports its theory and courts must be very cautious about retrofitting the guidelines to suit an individual judge's concepts of justice. Cf. United ___ ______ States v. Norflett, 922 F.2d 50, 53 (1st Cir. 1990) (explaining ______ ________ that judges "must subrogate personal views [about what sentences are too severe or too lenient] to the Congress' sense of how best to achieve uniformity"). When all is said and done, the best authority that the government can muster in support of this proposition consists of two cases, United States v. Booth, 996 _____________ _____ F.2d 1395 (2d Cir. 1993) (per curiam), and United States v. ______________ Tello, 9 F.3d 1119 (5th Cir. 1993). We find neither case _____ particularly helpful. In Booth the defendant, prior to his indictment for _____ sexual exploitation of children, made several attempts to keep his victims from talking to the FBI. In constructing the GSR, the district court employed both a two-level enhancement for obstruction of justice and a two-level decrease for acceptance of 17 responsibility under section 3E1.1(a). The court then declined to bestow an additional one-level reduction under section 3E1.1(b). Although the Second Circuit upheld the district court's decision, it did not squarely address the issue that confronts us today. Booth argued that he was entitled to the one-level reduction because of the extraordinary quality of his cooperation, not because his conduct satisfied the criteria set ___ forth in section 3E1.1(b). Here, however, Talladino makes the rather different argument, apparently overlooked by Booth, that timeliness is the only relevant inquiry under subsection (b). Thus, Booth is inapposite. _____ In Tello, the defendant obstructed justice after _____ pleading guilty by providing false information about his criminal history. The district court imposed a two-level enhancement for obstruction of justice and granted an offsetting two-level decrease for acceptance of responsibility. Despite Tello's admittedly timely guilty plea, the court did not afford him the additional one-level reduction under subsection (b). Tello appealed. The Fifth Circuit reversed, declaring that once an affirmative determination of acceptance of responsibility has been made, "no sentencing discretion remains." Tello, 9 F.3d at 1124. The court explicitly rejected the _____ district court's reliance on the defendant's obstruction of justice as a reason for denying the additional one-level reduction, explaining that: When the court granted [the defendant] the basic 2-level reduction for acceptance of 18 responsibility under subsection (a), despite having found obstruction of justice and having increased his offense level by two therefor, obstruction became irrelevant. It evaporated from the sentencing calculus. Id. at 1128. ___ Despite these seemingly unequivocal assertions, the government insists that Tello contains a per se exception for _____ ___ __ cases in which an obstruction of justice occurs prior to the defendant's tender of a guilty plea. To support this argument the government relies on the following footnote: This is not to say that, under greatly different circumstances, obstruction of justice could not constitute discretionary grounds for denying the additional 1-level decrease, such as when the defendant first _____ obstructs justice in the investigation of his offense and only subsequently admits his ____________ guilt and cooperates with the government. Id. at 1128 n.22 (citing Booth). ___ _____ The government's reliance on the dictum contained in footnote 22 is misplaced. Rather than creating a broad exception to the holding in Tello, footnote 22 merely leaves open the _____ possibility that a defendant's obstruction of justice might be _____ relevant to the sentencing court's timeliness inquiry under section 3E1.1(b). See, e.g., infra note 10. In other words, if ___ ____ _____ a defendant's obstruction of justice directly precludes a finding of timeliness under section 3E1.1(b), then a denial of the additional one-level decrease would be appropriate. If, however, the defendant's obstruction of justice has no bearing on the section 3E1.1(b) timeliness inquiry, as was the case in Tello, _____ 19 then the obstruction drops from the equation.9 We consider the Fifth Circuit's holding in Tello to be _____ much more convincing than the government's sanguine interpretation of footnote 22. We believe that such a holding is compelled by the language of the sentencing guidelines. The text of section 3E1.1, as the government concedes, does not confer discretion on the district court to deny the extra one-level reduction so long as certain stated prerequisites are satisfied. And there is no principled basis, linguistic or otherwise, for arguing that obstruction of justice affects this baseline interpretation of section 3E1.1(b). The commentary to the guidelines is to the same effect. It establishes that, in the universe of cases where obstruction of justice looms, a reduction for acceptance of responsibility is ordinarily forestalled altogether. See U.S.S.G. 3C1.1, comment. ___ (n.4). Yet, there will be "extraordinary cases in which adjustments under both 3C1.1 and 3E1.1 may apply." Id. The ___ use of the permissive word "may" makes it pellucid that the district court, having found obstruction of justice, has discretion to bypass section 3E1.1. Nonetheless, once the court finds that a case is "extraordinary" within the meaning of Application Note 4, the bypass option is blocked off, section 3E1.1 comes into play, and the court at that point is bound to  ____________________ 9The confusion surrounding footnote 22 stems in part from the inclusion of the phrase "discretionary grounds." This term appears to be used incorrectly in the context of a discussion of section 3E1.1(b), as the additional one-level decrease is not a matter of discretion, but of factfinding. 20 apply the guideline according to its own terms. Those terms do not permit an allowance to be made for the circuitous route by which the acceptance of responsibility guideline came to be applied in the first place. Our focus on the plain language of the guidelines and commentary is a necessary offshoot of the policy concerns undergirding the sentencing guidelines. The guidelines' primary purpose is to alleviate disparity in the sentencing of similarly situated offenders. See S. Rep. No. 225, 98th Cong., 2d Sess. ___ 38, 51, 161 (1984), reprinted in 1984 U.S.C.C.A.N. 3182, 3221, _________ __ 3234, 3344. "Ensuring uniformity inevitably means restricting judicial discretion." United States v. Jackson, 30 F.3d 199, 201 _____________ _______ (1st Cir. 1994). This phenomenon, in turn, places more emphasis on the text and purport of the guidelines. Where, as here, the text and purport of the guidelines are clear, courts may not tinker, but, rather, must apply the provision in question according to its tenor. After all, toying with the scope and meaning of carefully crafted guideline provisions would undermine the principle of uniformity that engendered the guidelines. See Norflett, 922 F.2d at 54 (stating ___ ________ that guidelines cannot "be adulterated by a judge's personal sense of inequity, no matter how well intentioned the judge may be"); see also Jackson, 30 F.3d at 204 (holding that the courts' ___ ____ _______ role vis-a-vis the Sentencing Commission is as "interpreters of the words chosen by [the Commission], not as policymakers or enlargers of [the Commission's] intent"). 21 Viewed against this backdrop, we are of the opinion that, in denying appellant the extra one-level reduction under section 3E1.1(b) because of his obstruction of justice, the ________________________________________ district court erred. Faced with this sort of dilemma, a court should pose two separate questions. First, the court should ask whether the defendant is entitled to receive any reduction for ___ acceptance of responsibility, given his obstruction of justice. The court can only answer this query in the affirmative by finding, inter alia, that the situation is "extraordinary." If, _____ ____ notwithstanding the height of this threshold, the court vaults it, makes the requisite finding, and answers the first question affirmatively, it is then obliged to award the defendant the standard two-level credit for acceptance of responsibility. At that juncture, the court should place obstruction of justice to one side and pose the second question, inquiring whether the defendant qualifies for an additional one-level reduction based on the timeliness of his acceptance of responsibility.10 In other words, once the initial inquiry has been resolved in the defendant's favor, with the explicit or implicit finding that his case is "extraordinary," the only relevant inquiry that remains is whether the defendant either: "(1) timely provid[ed] complete  ____________________ 10Of course, in some cases a particular act of obstruction may bear directly upon the criteria specified in section 3E1.1(b). For example, obstructive conduct might render information furnished to the government incomplete, even in an "extraordinary" case. In such a situation, the obstructive conduct can be considered during the second stage of the inquiry. Given the absence of findings in this case, however, we take no view as to how (if at all) this possibility might affect the proceedings on remand. 22 information to the government concerning his own involvement in the offense; or (2) timely notif[ied] authorities of his intention to enter a plea of guilty, thereby permitting the government to avoid preparing for trial and permitting the court to allocate its resources efficiently." U.S.S.G. 3E1.1(b). Here, the court in effect conflated these two inquiries. In following this course, the court erred. And, moreover, its error requires that appellant be resentenced. After all, the court made no findings whatever concerning the section 3E1.1(b) criteria. Furthermore, the record does not suggest an obvious basis for excluding appellant from the benefits of subsection (b). Consequently, we must vacate appellant's sentence to allow the district court a fresh opportunity to consider, in light of our opinion, whether appellant is, or is not, entitled to the additional one-level reduction under section 3E1.1(b). IV. CONCLUSION IV. CONCLUSION We need go no further. For the reasons discussed herein, we affirm appellant's conviction, but vacate his sentence and remand for resentencing. It is so ordered. It is so ordered. ________________ 23