USCA1 Opinion

 

 United States Court of Appeals
 For the First Circuit

No. 96-2158

 UNITED STATES,

 Appellee,

 v.

 THOMAS E. KNEELAND, JR.,

 Defendant, Appellant.

 APPEAL FROM THE UNITED STATES DISTRICT COURT

 FOR THE DISTRICT OF MASSACHUSETTS

 [Hon. Douglas P. Woodlock, U.S. District Judge]

 Before

 Stahl, Circuit Judge,
 Cyr, Senior Circuit Judge,
 and Shadur,* Senior District Judge.
 
 

 Michael C. Bourbeau, with whom Bourbeau & Bourbeau, Bonilla,
Tocchio & Floyd, LLP was on brief, for appellant.
 Daniel S. Goodman, Attorney, with whom Jonathan L. Kotlier,
Assistant United States Attorney, and Donald K. Stern, United
States Attorney, were on brief, for appellant.

June 23, 1998

 
 
_____________________
*Of the Northern District of Illinois, sitting by designation. STAHL, Circuit Judge. Following a jury trial, defendant-
appellant Thomas E. Kneeland, Jr. was convicted of conspiracy, mail
fraud, wire fraud, money laundering, and criminal forfeiture for
his role in a fraudulent scheme to solicit borrowers to pay
"advance fees" in connection with loan transactions that defendant
never intended to consummate. Kneeland appeals his convictions,
asserting that the district court unconstitutionally deprived him
of his Sixth Amendment right to counsel. He also challenges his
sentence on various grounds. We affirm the convictions and the
sentence. 
 I.
 From 1992 until March 1994, Thomas E. Kneeland, Jr. and
his partner, Brian Kelly, ran an "advance fee" scheme in which they
falsely represented themselves as experienced lenders backed by
Japanese and Greek investors. Under this pretense, they solicited
clients needing financing for commercial real estate projects. 
Kneeland and Kelly furthered the scheme through a corporation named
Nippon-American Funding, Inc. ("Nippon"), which Kneeland had
previously formed with two other individuals, and through a
Canadian corporation called Societe Kokusai Les Investissements,
S.A. ("Societe Kokusai"). 
 With the object of enticing victims to pay advance fees
in the expectation of receiving commercial loans, Kneeland and
Kelly advertised in major newspapers, seeking both borrowers and
brokers. Potential borrowers submitted to Kneeland and Kelly or to
a broker a description of the project for which they sought
financing, and shortly thereafter Kneeland or one of his brokers
responded, telling the would-be borrowers that they had received
preliminary approval from the Nippon Board of Directors or from the
Nippon Finance Committee. In fact, neither board existed. 
Subsequently, the borrowers met with Kneeland and Kelly. Within a
few days after that meeting, Nippon (or Societe Kokusai) sent the
borrowers contracts of acceptance, informing them that the only
other requirements before funding were site inspections,
underwriting, and due diligence reports, for which there would be
a fee. If borrowers questioned the amount of the fee as
unreasonably high, Kneeland and Kelly told them that part of the
fee went toward "block[ing] out funds with the investor" until the
underwriting process was completed.
 After site inspections and due diligence had been
conducted, Kneeland and Kelly issued borrowers commitment letters
and charged "commitment fees," which were described in the letters
as being "fully refundable at closing from the loan proceeds." The
agreements also provided, however, that the fee "shall be deemed to
be earned immediately by the lender in consideration of the
preparation of the issuance of the commitment." In addition, if
there were no closing, the commitment fee would not be refunded. 
Kneeland and Kelly led borrowers to believe that they would obtain
funding within thirty days if they paid the commitment fee. 
 Kneeland and Kelly then employed various strategies to
enable Nippon or Societe Kokusai to back out of the promised loan
transactions without refunding the borrowers' fees. Seventeen
groups of borrowers fell prey to the scheme, sending to Kneeland
and Kelly thirty-eight checks totaling $593,520.71. Kneeland and
Kelly did not endeavor to obtain funding for any of the borrowers
until the FBI had begun an investigation of the scheme. 
 Kneeland was arrested on March 31, 1994, and his assets
were civilly seized at the same time. Although the district court
appointed an attorney to represent him, he dismissed that attorney
as well as two others subsequently appointed by the court. After
the third dismissal, the district court declined to appoint a
fourth attorney. Appearing pro se, Kneeland was tried before a
jury in the United States District Court for the District of
Massachusetts, and was convicted on one count of conspiracy, in
violation of 18 U.S.C. 371; three counts of mail fraud, in
violation of 18 U.S.C. 1341; twenty-nine counts of wire fraud, in
violation of 18 U.S.C. 1343; twenty-nine counts of money
laundering, in violation of 18 U.S.C. 1956(a)(1)(A); twenty-five
counts of money laundering, in violation of 18 U.S.C. 
1956(a)(1)(B); eight counts of money laundering, in violation of 18
U.S.C. 1957(a); and one count of criminal forfeiture, in
violation of 18 U.S.C. 982. The district court, pursuant to
section 3B1.1 of the sentencing guidelines, applied a four-level
enhancement to the fraud counts for Kneeland's role as a leader or
organizer in the offenses and rejected Kneeland's request that the
fraud and money laundering counts be grouped together under
U.S.S.G. 3D1.2. It sentenced him to ninety-seven months'
imprisonment, to be followed by three years' supervised release,
and ordered him to pay restitution of $576,895.71 and, pursuant to
18 U.S.C. 3013, a special assessment of $4,750.
 II.
 On appeal, Kneeland argues (1) that he was denied his
Sixth Amendment right to effective assistance of counsel when the
district court declined to appoint a fourth attorney to represent
him at trial; (2) that the district court erred in failing to group
together the fraud and money laundering charges under U.S.S.G. 
3D2.1; (3) that the court erred in applying U.S.S.G. 3B1.1, which
permits a four-level enhancement if a defendant was an organizer or
leader in an offense; and (4) that there was insufficient evidence
as a matter of law to sustain his convictions for money laundering
under 18 U.S.C. 1956(a)(1)(B).
1. Effective Assistance of Counsel
 Kneeland asserts that, because he never implicitly or
explicitly waived his Sixth Amendment right to be represented by
counsel, the district court denied him that right by declining to
appoint a fourth attorney after he had requested the dismissal of
the first three, thereby forcing him to represent himself. In
particular, he asserts that the district court erred by failing to
make an adequate inquiry into his desire and ability to represent
himself and his awareness of the consequences of proceeding pro se. 
Under such circumstances, he contends, he cannot be regarded as
having clearly and unequivocally waived his right to counsel. 
Additionally, he argues that the district court abused its
discretion in refusing to delay the trial after his third attorney
had been dismissed and in declining to appoint standby counsel over
his own objections to such an appointment. Kneeland's arguments
are without merit.
 After his arrest, Kneeland at first stated that he
preferred to proceed pro se, rather than through counsel appointed
under the Criminal Justice Act, see 18 U.S.C. 3006A. Apparently,
after thinking better of it, he later informed the court that he
wished to have appointed counsel. The court then appointed Charles
P. McGinty, a federal public defender, to represent him. On
October 17, 1994, three weeks prior to the scheduled trial date,
Kneeland filed a motion captioned "motion to dismiss counsel,
recuse judge & appoint new counsel." The following week, the
district court denied the recusal motion, granted Kneeland's
request for new counsel, allowed McGinty to withdraw from the case,
and set a new trial date of May 22, 1995. 
 On December 6, 1994, the court appointed Max W. Beck, an
attorney on the Criminal Justice Panel, as Kneeland's new counsel. 
On May 2, 1995, fewer than three weeks prior to his new trial date,
Kneeland filed a motion for Beck to withdraw as his attorney,
claiming that Beck had improperly "refus[ed] to file a motion for
double jeopardy." The district court directed Kneeland to undergo
a psychiatric examination to determine his mental competency. 
After a psychologist reported that Kneeland's difficulties with his
counsel were not the product of a mental defect or illness and that
Kneeland was competent to stand trial, the court appointed a third
attorney, Roger A. Cox. Trial was rescheduled for January 2, 1996. 
 On August 11, 1995, Cox appeared as Kneeland's new
lawyer, and, on November 15, 1995, Kneeland sought termination of
Cox's services. On December 13, 1995, Kneeland requested a
"Monsanto hearing" in order to obtain properties subject to the
parallel civil forfeiture proceeding to pay for his own attorney. 
On December 19, 1995, the district court allowed Cox to withdraw as
Kneeland's attorney and postponed the trial until January 22, 1996,
but told Kneeland that no additional counsel would be afforded him. 
Although the court suggested that Cox act as standby counsel if
Kneeland decided to proceed pro se, Kneeland refused that offer. 
The district court postponed the trial another week to allow this
court to consider Kneeland's interlocutory appeal of the district
court's denial of his motion on an issue unrelated to this appeal,
but it denied his request for an additional continuance of 125
days. On January 25, 1996, the court denied Kneeland's motion for
a so-called Monsanto hearing regarding the funds subject to civil
forfeiture. Kneeland then proceeded to trial without the
assistance of counsel. 
 Because of the disadvantages to a defendant that inure
from pro se representation, a defendant must "knowingly and
intelligently" waive his right to counsel before he may be
permitted to proceed pro se. Johnson v. Zerbst, 304 U.S. 458, 464-
65 (1938). A defendant's decision in this regard is reasonably
regarded as knowing and intelligent if he has been "made aware of
the dangers and disadvantages of self-representation, so that the
record will establish that 'he knows what he is doing and his
choice is made with eyes open.'" Faretta v. California, 422 U.S.
806, 835 (1975) (quoting Adams v. United States ex rel. McCann, 317
U.S. 269, 279 (1942)). 
 After carefully reviewing the record, we are confident
that Kneeland effectively waived his right to counsel. First, his
waiver was express and knowing. The district court conducted
multiple pre-trial hearings at which the representation issue was
addressed. In those hearings, the court explicitly warned Kneeland
that without counsel he would "be at a significant disadvantage,"
that trying the case pro se was his "least attractive" alternative,
and that he was "far better served by -- at a minimum -- having
standby counsel available" for consultation. The record shows that
Kneeland accepted and understood the reasons behind the district
court's explicit warnings regarding the dismissal of Cox: after the
district court informed Kneeland that "no additional counsel will
be afforded to you other than the three who have been afforded to
you so far," Kneeland responded, "I don't think I'm entitled to
it." Although Kneeland initially stated that he "did not want to
go pro se, but [did not] want to use Mr. Cox," his ultimate
decision to proceed pro se was an unambiguous expression of his
preference. 
 We note that it was entirely proper for the trial court
to require Kneeland to choose between proceeding to trial with his
present attorney and representing himself. See Maynard v. Meachum,
545 F.2d 273, 278 (1st Cir. 1976) (holding that the district court
may properly give a defendant a choice "between proceeding with
counsel already appointed or going pro se"); see also Tuitt v.
Fair, 822 F.2d 166, 173 n.1 (1st Cir. 1987) (rejecting an argument
that a trial court could not properly force a defendant "to choose
between proceeding to trial with the unwanted attorney or
representing himself"). Thus, the district court was not bound to
defer to Kneeland's assertion that he wanted neither to proceed pro
se nor to have Cox represent him. By deciding to proceed pro se
rather than to accept representation by Cox even in the face of the
court's clear admonition, Kneeland knowingly waived his right to
counsel. In so holding, we disagree with Kneeland's suggestion
that this case is governed by our holding in Tuitt v. Fair that,
because a defendant's right to counsel is "in a sense" paramount to
the right to proceed pro se, a court need not accept a defendant's
choice to proceed pro se rather than to be represented by an
unwanted attorney, if the choice was not accompanied by an explicit
waiver of the right to counsel. 822 F.2d at 177. The question
here is not whether Kneeland should have been permitted to exercise
his right to self-representation; the question is whether he in
fact waived his right to counsel. We answer affirmatively not
because he ever stated, in so many words, that he did not want
attorney representation, but because he explicitly dismissed his
third court-appointed attorney in the face of ample warnings by the
district court that he would not be provided a fourth appointed
counsel.
 Second, the record demonstrates that Kneeland's waiver
was intelligent. We held in Maynard that,
 there is no particular piece of information that is essential
 to an effective waiver of counsel. An intelligent waiver does
 not require that the accused have the skill or knowledge of a
 lawyer. What is required . . . is a sense of the magnitude of
 the undertaking and . . . an awareness that there are
 technical rules governing the conduct of a trial . . . . The
 district court may properly consider, in addition to [the
 defendant's] background, experience and conduct, such factors
 as his involvement in previous criminal trials, his
 representation by counsel before trial, and the continued
 presence of advisory counsel at trial . . . . 
 
 545 F.2d at 279 (internal citations omitted); see also United
States v. Hafen, 726 F.2d 21, 25 (1st Cir. 1984) (citing Maynard).
The district court ordered that Kneeland undergo a psychiatric
examination to ensure that he understood the consequences of his
actions. The psychologist who examined Kneeland concluded that he
was "capable of rationally waiving . . . the right to counsel," a
conclusion that is further supported by the facts that he is a
(disbarred) lawyer and therefore cannot have been unaware of the
advantages of being represented by counsel, and that, as revealed
in the record, his defense was effective, if not successful. 
During the trial, Kneeland called twelve defense witnesses and
cross-examined several of the government's witnesses. He also
presented a closing argument in which he attempted to discredit
government witnesses as convicted felons who had succumbed to
government pressure, pointed to perceived logical fallacies in the
government's case, and described his potential borrowers as
sophisticated business people who had been rejected by traditional
lenders and who acted unreasonably in paying the fees he had
charged. Although Kneeland asserts that the court placed undue
weight on his legal training and should have made more extensive
inquiry into his awareness of the consequences of self-
representation, as we have discussed above, the record amply
supports the lower court's conclusion that Kneeland was fully aware
of the disadvantages he would face as a pro se defendant. No more
inquiry was needed.
 Of course, we still could not conclude that Kneeland's
waiver of counsel was effective if he had a valid reason for
needing new appointed counsel that is, if his waiver was, in
effect, involuntary. But Kneeland has made no such showing. A
defendant does not, under the Sixth Amendment, have an absolute
right to counsel of his own choosing. See, e.g., United States v.
Diaz-Martinez, 71 F.3d 946, 949 (1st Cir. 1995); United States v.
Poulack, 556 F.2d 83, 86 (1st Cir. 1977). "While a defendant may
not be forced to proceed to trial with incompetent or unprepared
counsel, a refusal without good cause to proceed with able
appointed counsel is a 'voluntary' waiver." Maynard, 545 F.2d at
278 (internal citations omitted). Whether a defendant's decision
was voluntary thus depends on whether his objections to his
appointed counsel "were such that he had a right to a new appointed
counsel." Id.
 Evaluating the propriety of a trial court's denial of a
motion for substitution of counsel requires us to consider such
factors as the timeliness of the motion, the adequacy of the
district court's inquiry into the defendant's complaint, and
whether the conflict between the defendant and his counsel was so
great as to have resulted in a total lack of communication,
preventing an adequate defense. See United States v. Allen, 789
F.2d 90, 92 (1st Cir. 1986) (citing Hudson v. Rushen, 686 F.2d 826,
829 (9th Cir. 1982)). The district court here conducted an
adequate inquiry into Kneeland's reasons for wanting new counsel. 
Kneeland had filed a lengthy memorandum describing why Cox's
representation was inadequate. This memorandum was supplemented by
hearings, held in November and December of 1995, in which the
district court addressed Kneeland's dissatisfaction with his
counsel. We are satisfied that the district court's hearings 
combined with its knowledge of Kneeland's history of dismissing
counsel adequately probed Kneeland's position with regard to
counsel. The record supports the court's conclusions:
notwithstanding Kneeland's complaints that Attorney Cox "failed to
do as [Kneeland] instructed [him] to do," there is no indication
that Cox's representation was less than competent, or that the
dynamic between Kneeland and Cox would prevent an adequate defense. 
As for whether Kneeland's request for new counsel was timely,
Kneeland contends that he requested a change of attorney "as early
as November 30, 1995;" the trial at that point was scheduled to
begin on January 2, 1996. Although we conclude that the motion was
not necessarily untimely, this conclusion does not modify our
determination that the district court acted within its discretion
in declining to provide substitute counsel. 
 Proceeding to Kneeland's remaining Sixth Amendment
contentions, the district court did not, as Kneeland suggests,
abuse its discretion by denying Kneeland's request for a four-month
continuance. Although a refusal of a continuance that effectively
denies an accused the ability to represent himself may constitute
an abuse of discretion and a Sixth Amendment violation, see Barhamv. Powell, 895 F.2d 19, 22 (1st Cir. 1990), the court did not in
this case deny Kneeland's request for a continuance but instead
postponed the trial until January 22, 1996, and eventually
postponed it another week, until January 29. This continuance was
only one of many that the court had already granted to accommodate
Kneeland's numerous motions to dismiss counsel; Kneeland's trial
was originally scheduled to begin on November 7, 1994. In light of
these circumstances, we find no abuse of discretion in the district
court's decision not to postpone the trial beyond January 29, 1996,
more than fourteen months after his trial was originally scheduled
to begin.
 We also see no error in the trial court's decision not to
appoint standby counsel over Kneeland's objections. As the
government points out, after Kneeland had clearly expressed his
intention to proceed pro se, the district court emphasized that
Kneeland would be "at a significant disadvantage" without standby
counsel and urged him to accept Cox in that capacity "to discuss
things with and to facilitate matters if it becomes necessary
during the course of trial." Kneeland rejected this suggestion. 
Although a trial court may appoint standby counsel against a
defendant's wishes, see Faretta, 422 U.S. at 834 n.46, it is not
required to do so, see United States v. Webster, 84 F.3d 1056, 1063
(8th Cir. 1996) ("Appointment of standby counsel is within the
discretion of the district court, and a pro se defendant does not
enjoy an absolute right to standby counsel.") (citing Locks v.
Sumner, 703 F.2d 403, 407 (9th Cir. 1983)); United States v.
Nivica, 887 F.2d 1110, 1121 (1st Cir. 1989) ("A defendant has no
right to hybrid representation."). That the district court did not
appoint backup counsel in the face of Kneeland's objections strikes
us as well within its discretion.
 In short, we think that the district court went to great
lengths to accommodate Kneeland's right to counsel, repeatedly
advising Kneeland against proceeding pro se, and suggesting that,
at a minimum, he accept standby counsel for consultation purposes. 
Under these circumstances, Kneeland may be regarded as having
knowingly and intelligently waived his right to counsel. The
district court did not err in permitting Kneeland to proceed to
trial without counsel. 
2. Grouping Fraud and Money Laundering Counts
 Kneeland next argues that the court erred by failing to
"group" for sentencing purposes, under subsection (d) of U.S.S.G.
 3D1.2, his fraud and money laundering convictions. The trial
court found that, although the money laundering and fraud counts
were "to some degree related," they were nonetheless "distinctive"
offenses and thus should not be grouped. 
 To the extent that this issue implicates the relevant
sentencing guideline's legal meaning and scope, our review is denovo. See United States v. Voccola, 99 F.3d 37, 43 (1st Cir.
1996). We defer, however, to the trial court's factual findings
unless they are clearly erroneous. See id. The introductory
commentary to Part D of Chapter 3 of the sentencing guidelines
states that "counts that are grouped together are treated as
constituting a single offense for purposes of the guidelines." 
Section 3D1.2 of the guidelines, labeled "Groups of Closely Related
Counts," provides:
 All counts involving substantially the same harm shall be
 grouped together into a single Group. Counts involve
 substantially the same harm within the meaning of this rule:
 
 (a) When counts involve the same victim and the same act or
 transaction.
 
 (b) When counts involve the same victim and two or more acts
 or transactions connected by a common criminal objective
 or constituting part of a common scheme or plan.
 
 (c) When one of the counts embodies conduct that is treated
 as a specific offense characteristic in, or other
 adjustment to, the guideline applicable to another of the
 counts.
 
 (d) When the offense level is determined largely on the basis
 of the total amount of harm or loss, the quantity of a
 substance involved, or some other measure of aggregate
 harm, or if the offense behavior is ongoing or continuous
 in nature and the offense guideline is written to cover
 such behavior.
 
 . . . .
 
 Subsection (d) provides a list of thirty-four guidelines covering
offenses that "are to be grouped" thereunder; the list includes
sentencing guidelines sections 2F1.1 (fraud) and 2S1.1 (money
laundering).
 Following Kneeland's presentence report ("PSR"), the
district court grouped the conspiracy, mail fraud, and wire fraud
counts (counts 1 through 4 and 6 through 34) and applied U.S.S.G.
 2F1.1. Pursuant to that guideline, the court added, to the base
offense level of six, ten offense levels based on a total loss of
more than $500,000. After applying section 2F1.1(b)(2) to add two
more levels for more than minimal planning and a scheme to defraud
more than one victim, a four-level role-in-the-offense enhancement
pursuant to section 3B1.1(a), and a two-level enhancement for
obstruction of justice under section 3C1.1, the court ultimately
arrived at an adjusted offense level of 24. The court then
combined into a second group counts 35 through 96, all of which
involved money laundering offenses, and applied U.S.S.G. 2S1.1. 
Beginning with a base offense level of 23, it added one offense
level based on a value of funds laundered between $100,000 and
$200,000. After applying a two-level enhancement for obstruction
of justice, it calculated an adjusted offense level of 26. 
Finally, the court applied section 3D1.4 to calculate the combined
offense level for the two groups of offenses, arriving at a total
of 28. Had the court combined the fraud and money laundering
convictions into a single group, Kneeland contends, his total
offense level would have been 26, rather than 28.
 Kneeland argues that, although we have previously found
that fraud and money laundering should not be grouped together, seeUnited States v. Lombardi, 5 F.3d 568, 570 (1st Cir. 1993), other
circuits have held that grouping is appropriate where the money
laundering and fraud schemes had the same victims, and the money
laundering activities advanced the fraud scheme, see United Statesv. Wilson, 98 F.3d 281, 283 (7th Cir. 1996); United States v.
Leonard, 61 F.3d 1181, 1186 (5th Cir. 1995). He asserts that
section 3D1.2(d) encompasses the fraud and money laundering counts
here because, in his case, the victims of the money laundering
counts were the same as the victims of the fraud counts and because
the depositing of victims' funds in financial institutions, which
gave rise to the money laundering counts, was, as in Wilson,
incidental to the continuation of the advance fee scheme. To
buttress this contention, Kneeland notes that he utilized the funds
to pay for continued operations, site inspections, travel, and
other costs involved in an ongoing, albeit fraudulent, loan
brokerage operation. 
 As Kneeland explicitly argues only that subsection (d) of
section 3D1.2 mandates grouping in his case, we limit our analysis
to whether Kneeland's case meets the requirements of that
subsection -- an issue left open by our opinion in Lombardi. We
note that although Kneeland relies heavily on Leonard, 61 F.3d at
1185-86, to support his contention that subsection (d) governs his
case, it is apparent that the Fifth Circuit in that case evaluated
the defendant's counts under the criteria set forth in subsection
(b) rather than those set forth in subsection (d). The Leonardpanel found that the defendant's fraud and money laundering
activities were part of the same continuing common criminal
endeavor and that they involved the same victims. Although these
determinations are relevant to subsection (b), the court appeared
to rely on subsection (d) to conclude that the offenses were
properly grouped because the guidelines for both offenses were
listed in that subsection. It did not, however, consider whether
the counts actually fit within subsection (d)'s substantive
requirements.
 Section 3D1.2(d) applies, at least so far as is relevant
here, in circumstances in which the offense level for a given set
of counts "is determined largely on the basis of the total amount
of harm or loss." Although we make no determination as to the
scope of this subsection, we focus on the term "largely" to
conclude that subsection (d) does not encompass Kneeland's fraud
and money laundering convictions because the offense level for
money laundering is generally not determined on the basis of total
harm. 
 We do not dispute that the terms of U.S.S.G. 2F1.1, the
sentencing guideline covering fraud, indicates that fraud properly
falls within the requirements for grouping set out in section
3D1.2(d). Fraud has a base offense level of only six, which by
itself would give rise to a "Zone A" sentence, involving zero to
six months' custody, see U.S.S.G. ch. 5, pt. A. That base level of
six is subject to relatively large increases on the basis of the
financial magnitude of the fraud ("the total amount of the harm or
loss"). For example, one offense level is added to the base level
if the loss is greater than $2,000, two levels are added if it is
greater than $5,000, and so on, up to a maximum 18-level increase
if the loss is greater than $80 million. See U.S.S.G. 
2F1.1(b)(1). Because the base offense level may be quadrupled on
the basis of the total amount of loss, the offense level arguably
is determined "largely" on the basis of total loss.
 The guideline covering money laundering, U.S.S.G. 2S1.1
is a different matter. Under that section, the base offense level
for any money laundering is 23, a level that by itself would call
for a sentence of 46 to 57 months' custody, see U.S.S.G. ch. 5, pt.
A. That substantial base offense level is subject only to modest
increases on the basis of amount laundered, at least until that
amount becomes very large. Thus, there is no increase whatever if
the laundered amount is no more than $100,000. See U.S.S.G. 
2S1.1(b)(2). If, as in Kneeland's case, the amount involved in the
laundering activity is between $100,000 and $200,000, there is just
a one-level increase. See id. This increase represents just five
or six months' custody, or approximately ten percent of the
sentence corresponding to the base offense level. Without making
any determination as to whether there are situations in which the
offense level for money laundering might be largely determined on
the basis of total amount of harm or loss, we are persuaded that,
in this case at least, the offense level for money laundering was
not based on aggregate harm and thus does not fall within the
purview of subsection (d). Accordingly, we see no error in the
district court's decision not to group the fraud and money
laundering counts under section 3D1.2(d).
3. Enhancement for Role as Organizer
 Kneeland next argues that the trial court erred in its
guideline calculations by finding that his sentence for the fraud
counts should be enhanced four levels for his alleged role as an
organizer and leader in the offense. He asserts that, in fact, he
was at most an equal partner in the fraud conspiracy with co-
defendant Brian Kelly, who received no such role-based increase.
 Reviewing the district court's determination "only for
clear error or mistake of law," see United States v. Talladino, 38
F.3d 1255, 1261 (1st Cir. 1994), we detect no reversible error. 
Sentencing guideline section 3B1.1(a) permits a four-level increase
if "the Defendant was an organizer or leader of a criminal activity
that involved five or more participants or was otherwise
extensive." The district court found that Kneeland's criminal
activities met the requirements of the "otherwise extensive" prong
of this section and, accordingly, applied a four-level sentence
enhancement. The record shows that it was Kneeland who formed
Nippon, rented office space for its operations, and invited Kelly
to join him in the fraudulent advance fee scheme. In addition,
Kneeland directed the meetings with the victims of the scheme and
explained the loan program to them. Kneeland held himself out as
the president of Nippon and also represented that he controlled its
board of directors. The district court's finding was thus amply
supported.
 Even if we were to assume that Kelly's role in the
advance fee scheme was commensurate with Kneeland's, this argument,
without more, would not provide a basis for overturning the
enhancement. We have held that "a perceived need to equalize
sentencing outcomes for similarly situated codefendants, without
more, will not permit a departure from a properly calculated
guideline sentencing range." United States v. Wogan, 938 F.2d
1446, 1448 (1st Cir. 1991); see United States v. Romolo, 937 F.2d
20, 25 n.5 (1st Cir. 1991); United States v. Carr, 932 F.2d 67,
72-73 (1st Cir. 1991) (quoting United States v. Joyner, 924 F.2d
454, 460-61 (2d Cir. 1991)). The logic that departures may not be
employed to equalize similarly situated codefendants counsels that
properly applied enhancements should not be avoided to achieve the
same objective. See U.S.S.G. 3B1.1, comment. (n.4) ("There can,
of course, be more than one person who qualifies as a leader or
organizer. . . .").
 Kneeland further asserts, however, that applying the
enhancement for his role as organizer or leader in the offense,
when combined with the enhancement for more than minimal planning
under U.S.S.G. 2F1.1(b)(2), amounts to impermissible "double
counting" because the same factors were used as a basis for both
enhancements. This argument is meritless. In 1993 the sentencing
guidelines were amended to explicitly provide that, "[a]bsent an
instruction to the contrary, the adjustments from different
guideline sections are applied cumulatively (added together). For
example, the adjustments from 2F1.1(b)(2) (more than minimal
planning) and 3B1.1 (aggravating role) are applied cumulatively." 
U.S.S.G. 1B1.1, comment. (n.4); see, e.g., United States v.
Cobleigh, 75 F.3d 242, 251 (6th Cir. 1996). It was not error for
the district court to apply both enhancements.
4. Sufficiency of the Evidence
 Finally, Kneeland argues that his convictions for money
laundering under 18 U.S.C. 1956(a)(1)(B)(i) should be reversed
because there was insufficient evidence as a matter of law that he
intended to conceal the funds deposited in and transferred among
various financial institutions. He argues that because Thomas
Zappala, the government auditor charged with tracing the funds, was
not misled and, in fact, testified that the funds could have been
traced through the various banks in a matter of minutes, no intent
to conceal the funds may be attributed to him. 
 In reviewing the sufficiency of the evidence, we evaluate
the evidence, including all reasonable inferences, in the light
most favorable to the verdict. See United States v. Isabel, 945
F.2d 1193, 1201 (1st Cir. 1991). To prove a violation of section
1956 (a)(1)(B), the government was required to show that Kneeland
engaged in financial transactions involving the proceeds of
unlawful activity, knowing that the proceeds were from unlawful
activity and that the transactions were designed "to conceal . . .
the nature, the location, the source, the ownership, or the control
of the proceeds of specified unlawful activity." 18 U.S.C. 
1956(a)(1)(B)(i); see Isabel, 945 F.2d at 1201. 
 After reviewing the record, we find that the government
presented sufficient evidence at trial to establish Kneeland's
guilt beyond a reasonable doubt on counts 64-88, the twenty-five
counts of money laundering at issue. Kneeland transferred funds
from the Nippon and Societe Kokusai accounts into two personal bank
accounts in Massachusetts. From those accounts, he moved money to
a bank in Los Angeles and to a brokerage account in Boston. He
then transferred some of this money to a Chicago commodities
brokerage firm and then back to one of his Massachusetts bank
accounts. Eventually, he used some of the money to purchase a car. 
We reject Kneeland's argument that, because Zappala was not misled,
Kneeland could not have had the requisite intent to conceal the
funds. As the government rightly notes, Kneeland's argument
ignores the context of Zappala's testimony. On cross examination,
Kneeland (acting as his own attorney) asked Zappala how long it
would take him to trace the flow of money through the various
accounts assuming that he already had all the relevant transaction
records and account information. Given that assumption, Zappala
testified that tracing the money flow would take only minutes. On
redirect examination, however, Zappala explained that doing the
research necessary to find the relevant accounts and to compile the
paper trail of information can take months. Such testimony, viewed
in the light most favorable to the government, in combination with
the evidence of Kneeland's numerous transfers of ill-gotten funds
and his repeated use of cashier's checks, sufficed to support the
jury's guilty verdicts on counts 64-88.
 In sum, we reject all of Kneeland's arguments and affirm his
convictions and his sentence.